Max **SANDERS**, Plaintiff,

v.

**OHMITE HOLDING, LLC, a Delaware limited liability company, Defendant.**

**C.A. No. 5145–VCL.**

Court of Chancery of Delaware.

Submitted: Dec. 17, 2010.
Decided: Feb. 21, 2011.

Robert K. Beste, III, Smith, Katzenstein & Jenkins LLP, Wilmington, Delaware; Robert J. Zaideman, Zaideman & Esrig, P.C., Chicago, Illinois; Attorneys for Plaintiff.

Bruce E. Jameson, Tanya E. Pino, Prickett Jones & Elliott P.A., Wilmington, Delaware; Amy G. Doehring, McDermott Will & Emery LLP, Chicago, Illinois; Attorneys for Defendant.

## *OPINION*

LASTER, Vice Chancellor.

Plaintiff Max Sanders seeks books and records from Ohmite Holding, LLC ("Ohmite" or the "Company"), pursuant to Section 18–305 of the Delaware Limited Liability Company Act (the "LLC Act"), 6 *Del. C.* § 18–305. When the Company was formed, Sanders loaned $2 million to one of its members and received a security interest in the member's units as collateral. In February 2007, the member transferred his remaining units to Sanders. In October 2008, Sanders discovered that his resulting interest was not the 7.75% stake that he believed and had been told that he owned, but rather a nigh microscopic 0.000775%. Sanders understandably sought to investigate how this happened. Ohmite refused to provide any information, contending that the dilative event pre-dated when Sanders formally became a member and that Sanders had no right to obtain books and records from the pre-membership period.

Sanders has a proper purpose for inspecting books and records. He is entitled to inspect those books and records that are necessary for him to fulfill his purpose, regardless of whether they pre-date when he formally acquired member status. Summary judgment is granted for Sanders.

## I. FACTUAL BACKGROUND

The facts are drawn from the parties' submissions in support of their cross motions for summary judgment. The parties agree that disposition of the motions is governed by Rule 56(h). Pursuant to that rule, when both sides cross move for summary judgment and neither argues there is a genuine issue of fact that is material to either motion, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions." Ct. Ch. R. 56(h).

### A. The Formation Of Ohmite

Ohmite is a Delaware limited liability company with its principal place of business in Illinois. It was formed in February 1998 in connection with the merger of Ohmite Manufacturing Company and Pico–Matic, Inc., both owned by Sanders, and various other entities owned by The Heico Companies LLC ("Heico"). The merger was effected pursuant to a merger agreement by and among Sanders, Heico, Heico Ohmite, L.L.C., Heico Pico–Matic, L.L.C., Ohmite Manufacturing Company, Inc., and Pico–Matic, Inc. (the "Merger Agreement" or "MA"). The Merger Agreement was dated as of and closed on February 12,

1998. Ohmite emerged from the transaction as the holding company that owned the surviving companies.

In connection with the merger, Sanders loaned $2 million to James Horne, the pre-merger president of Ohmite Manufacturing and post-merger president of Ohmite. Horne used the funds to purchase 20.66 of Ohmite's 100 membership units, giving him a 20.66% membership interest. The loan was not a side deal between Sanders and Horne; it was contemplated by the Merger Agreement itself. *See* MA § 5.13. The Merger Agreement further provided that the loan would be "secured by, among other things, a collateral assignment of Horne's equity interest in [Ohmite] ... in favor of Sanders." *Id.* Horne and Sanders also entered into a Collateral Assignment of Membership Interest (the "Collateral Assignment" or "CA"), dated contemporaneously with the Merger Agreement. Section 2 of the Collateral Assignment provided that

> [Horne] hereby assigns, grants a security interest in, transfers and delivers unto [Sanders] a continuing security interest in each of the following (the "Collateral"):
>
> (a) all of [Horne's] right, title and interest in and to all membership interests in the L.L.C. (the "Assigned Membership Interests") ... and all distributions, cash, securities, instruments, rights and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Assigned Membership Interests;
>
> . . . .

(c) all other rights appurtenant to the property described in clauses (a) and (b) above (including, without limitation, voting rights); and

(d) all cash and noncash proceeds of any and all of the foregoing.

CA § 2. The Collateral Assignment granted Sanders a broad power of attorney to protect his investment and interest in Horne's membership units. *Id.* § 9. Ohmite executed the Collateral Assignment and acknowledged that the Company had "received and reviewed a complete copy of the above Assignment and hereby acknowledges and consents to the foregoing Assignment and the delivery of the Collateral by Assignee pursuant to its terms." *Id.* at 10.

## B. Subsequent Transactions In Horne's Units

On February 20, 1998, Ohmite engaged in a recapitalization. Horne's 20.66 units were converted into 15.5 units, which represented a 15.5% interest in the Company.

In May 2000, Ohmite repurchased half of Horne's units for $1 million. Ohmite paid the $1 million directly to Sanders, as contemplated by the Collateral Assignment. CA § 2(a). Sanders released his lien on the 7.75 repurchased units. The lien remained in place as to the balance. Sanders and Horne understood the 7.75 units to constitute a 7.75% interest in Ohmite. *See* Sanders Aff. ¶ 4.[1]

On February 28, 2007, Horne assigned his remaining 7.75 membership units in Ohmite to Sanders. An agreement titled "Assignment of Membership Interest" pro-

---

1. The parties have not joined issue as to what percentage interest the 7.75 units then represented. Sanders believes the figure is 7.75%. Ohmite does not say what the pre-dilution percentage was. The record on the cross motions for summary judgment does not indicate that any other units were redeemed, in which case Horne would have held 7.75 out of 92.25 units, representing an undiluted interest of 8.40%. Depending on the number of units issued in the dilative event, the post-dilution interest could well have ended up at 0.000775%. Because the specific percentage is not relevant to my decision, I have adopted the parties' figures.

vides that Horne "does hereby transfer unto MAX SANDERS all of my right, title, and Membership Interest in 7.75% [sic] Voting Units of OHMITE HOLDING, LLC." Sanders sent a copy of the assignment to Ohmite's then-president, Steve Frediani.

Despite receiving notice of the assignment, Ohmite refused to acknowledge that Sanders had become a member. On November 5, 2007, Sanders filed a declaratory judgment action against Ohmite in Illinois state court, seeking a declaration that he was a member of Ohmite. By letter dated December 11, 2007, Ohmite conceded that "7.75 Units have been transferred" from Horne to Sanders.

With the ownership issue resolved, Sanders sent Ohmite a letter dated March 13, 2008, in which he sought to inspect certain books and records. When Ohmite declined to produce the documents, Sanders amended his Illinois complaint to add the books and records issue.

## C.   The Shrunken Interest

In October 2008, Sanders received his first Schedule K–1 from Ohmite. It reported that Sanders owned only a 0.000775% stake in Ohmite, *one ten-thousandth* of the interest Horne held after the May 2000 repurchase. Until he received the Schedule K–1, Sanders believed he owned 7.75 units constituting a 7.75% stake.

By letter dated October 29, 2008, Sanders sought an explanation for the dilution and requested confirmation that there had been no distributions in 2007 or 2008. By letter dated November 6, 2008, Ohmite offered a terse explanation:

In July of 2003, the Company required additional capital to continue . . . its business operations. As a result, the Company issued additional units to obtain that capital. Mr. Horne was given an opportunity to purchase additional units, but declined. As a result of the issuance, Mr. Horne's ownership percentage changed to the 0.000775% that is shown on Mr. Sanders' K–1 for 2007.

Polesky Aff. Ex. 16. This was the first Sanders heard of additional units being issued.

On August 7, 2009, the Illinois court dismissed Sanders's books and records claim for lack of jurisdiction. On December 1, 2009, Sanders voluntarily dismissed the remainder of his Illinois suit without prejudice.

## D.   The Demand

By letter dated November 6, 2009, Sanders sought books and records relating to the dilution of Horne's (and now his) membership interest (the "Demand Letter"). He requested the following books and records:

1.   Minutes of any meetings of membership, shareholders or management which relate to the dilution of Mr. James Horne's interest in Ohmite from 7.75% to .000775%;

2.   Records of all distributions to shareholders since February 28, 2007;

3.   All quarterly and annual financial reports, balance sheets, cash flow reports, statements of assets, liabilities and shareholders' equity, statements of revenue and expenses, and any similar documentation reflecting financial performance for the period July, 2003 to the present;

4.   Federal and state tax returns filed by Ohmite from 2003 to the present;

5.   Information relating to any K–1 forms issued or to be issued by Ohmite since January 1, 2007;

6.   Documents reflecting the number of additional units issued by and sold by Ohmite in connection with its efforts to raise capital in and since July, 2003;

7. Documents reflecting the amount of capital raised as a result of the sale of additional units in Ohmite in and since July, 2003; and

8. Documents reflecting or relating to any opportunity or notice provided to James Horne and/or Max Sanders for the purchase of additional units in Ohmite.

Polesky Aff. Ex. 19. The Demand Letter explained that Sanders sought the documents "to evaluate the value of [his] ownership interest, the status of the business and financial condition of Ohmite, the performance of Ohmite's management and the legitimacy of the dilution of [his] interests in Ohmite from 7.75% to .000775% of Ohmite." *Id.*

By letter dated November 13, 2009, Ohmite denied the request in whole. The letter stated that:

> While the Company wishes to cooperate with your client, while reserving all legal rights, we believe that this demand is not reasonable, is unduly burdensome and not necessary to accomplish the purpose articulated in your letter. The demand fails to set forth *any* facts indicating why Sander [sic] needs to evaluate the value of his ownership status, the status of the business and financial condition, the performance of the Company's management and the legitimacy of the "dilution" of Sanders's interest in the Company beyond the financial information that the Company has already provided Mr. Sanders. Mr. Sanders has not asserted that the "dilution" was illegitimate, and indeed, Mr. Sanders cannot make such an assertion since he was not a member of the Company at the time of the transaction. Instead, it appears that the actual purpose of Sanders's demand is to conduct a fishing expedition in an attempt to discover information that would provide a basis to file suit against the Company. This is not a proper purpose for conducting an inspection of books and records under 6 *Del. C.* Section 18–305.

Polesky Aff. Ex. 20. On December 16, 2009, Sanders filed this action.

In spring 2010, Ohmite provided copies of tax returns and unaudited financial statements for 2007, 2008, and 2009. The tax returns show that Hawthorne Partners II, LLC, now owns 99.993101% of Ohmite. Hawthorne Partners II, LLC is related to Hawthorne Partners, L.L.C., which was originally, and presumably still is, the manager of Ohmite. The tax returns also indicate that Ohmite had a liability of $20 million "due to an affiliate" at the end of 2006, and that that debt decreased substantially in the following years. Polesky Aff. Ex. 23.

Sanders infers from these facts that Ohmite issued the additional units to an affiliate of its manager. Sanders also infers that the units were underpriced. In 1998, when Ohmite was formed, the issuance to Horne was priced at approximately $129,000 per unit (accounting for the nearly contemporaneous recapitalization from 20.66 units to 15.5 units). In May 2000, when Ohmite repurchased 7.75 of Horne's units, the $1 million payment reflected the same valuation. Some time between May 2000 and February 2007 (probably in July 2003, *see* Polesky Aff. Ex. 16), Ohmite apparently issued some one million new voting units for an amount of consideration that it refuses to reveal. If issued at the same valuation used in 2000, Ohmite would have received approximately *$129 billion* in exchange for the new units, a cash infusion of colossal magnitude for an entity like Ohmite that would have left at least traces, if not indelible marks, in the limited records that Sanders received. And if Ohmite's operations had increased in value since 2000, then the $129 billion figure would be low.

From these facts and their logical inferences, Sanders suspects (not just credibly, but reasonably) that Ohmite issued units in a related-party transaction at a deep discount. He consequently questioned "whether Ohmite received proper consideration for the additional units issued," Sanders Aff. ¶ 11, and "whether [Ohmite] has been and is being operated exclusively for the benefit of it[ ]s principal owner Hawthorne Partners II, LLC, ... rather than the members as a whole." *Id.* ¶ 12.

Sanders has requested the books and records at issue to answer those questions. Other than the tax returns and unaudited financial statements for 2007, 2008, and 2009, and Sanders's Schedule K–1s for those years, Ohmite has refused to provide Sanders with the books and records he seeks.

## II. LEGAL ANALYSIS

Section 18–305(a) of the LLC Act provides a member of an LLC with the right, "upon reasonable demand for any purpose reasonably related to the member's interest as a member" of the LLC, to obtain the following records:

(1) True and full information regarding the status of the business and financial condition of the limited liability company;

(2) Promptly after becoming available, a copy of the limited liability company's federal, state and local income tax returns for each year;

. . . .

(5) True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each member and which each member has agreed to contribute in the future, and the date on which each became a member; and

(6) Other information regarding the affairs of the limited liability company as is just and reasonable.

6 *Del. C.* § 18–305(a). The inspection right is subject to "such reasonable standards (including standards governing what information and documents are to be furnished ...) as may be set forth in a limited liability company agreement or otherwise established by the manager." *Id.*

### A. The LLC Agreement Does Not Limit The Members' Right To Inspect Ohmite's Books And Records.

■ Ohmite's internal affairs are governed by the Amended and Restated Limited Liability Company Agreement of Ohmite Holding, LLC (the "LLC Agreement"). Pursuant to the LLC Agreement, "[t]he Company's books and records shall be maintained at the principal office of the Company" in Chicago. LLC Agreement § 10.4. In addition, "[e]ach Member shall receive copies of any annual audited financial statements prepared for the Company promptly after receipt by the Company." *Id.* § 10.5. Otherwise, each member's rights to access books and records are "as provided in the [Delaware LLC] Act." *Id.* § 2.

Ohmite argues that the LLC Agreement limits member inspection rights by providing that "an assignee who is not a Member shall not be entitled to participate in the management of the Company's affairs, vote, receive any information of Company transactions or inspect the Company books." LLC Agreement § 11.2. According to Ohmite, because Sanders was not a member before February 28, 2007, this provision bars Sanders from obtaining any books and records from before that date.

Section 11.2 deals with the informational rights of assignees. If Sanders were an assignee, then Section 11.2 would apply.

Sanders is not an assignee. He is a member.

The LLC Agreement does not limit a member's inspection rights. Nor is there any evidence that Ohmite's managers have established any standards to govern a member's exercise of inspection rights. Therefore, the scope of Sanders's inspection rights is co-extensive with Section 18–305 of the LLC Act.

## B.  Sanders Has A Proper Purpose.

■ Delaware courts have interpreted Section 18–305 by looking to "cases interpreting similar Delaware statutes concerning corporations and partnerships." *Somerville S Trust v. USV P'rs, LLC*, 2002 WL 1832830, at *5 n. 4 (Del.Ch. Aug. 2, 2002) (citing cases applying 8 *Del. C.* § 220, the corporate-law counterpart to 6 *Del. C.* § 18–305, to interpret Section 18–305). To inspect books and records, a member of a Delaware LLC, like a stockholder of a Delaware corporation, "must first establish by a preponderance of the evidence the existence of a 'proper purpose' for inspection. A proper purpose is one that is 'reasonably related to such person's interest' as a member...." *Id.* at *5.

Ohmite contends that Sanders cannot have a proper purpose for inspecting books and records because he was not yet a member at the time of the events he seeks to investigate. The LLC Act does not impose any such limitation. In the analogous corporate context, the Delaware Supreme Court has held that "[i]f activities that occurred before the [date on which the plaintiff became a stockholder] are 'reasonably related' to the stockholder's interest as a stockholder, then the stockholder should be given access to records necessary to an understanding of those activities." *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 117 (Del.2002). The bright-line temporal bar that Ohmite advocates has been rejected, and Ohmite has

not suggested any credible reason grounded in the language, structure, or policy of the LLC Act for a different rule to apply to LLCs.

■ Sanders's purposes are otherwise proper. His demand states that he seeks to inspect books and records

to evaluate the value of [his] ownership interest, the status of the business and financial condition of Ohmite, the performance of Ohmite's management and the legitimacy of the dilution of [his] interests in Ohmite from 7.75% to .000775% of Ohmite.

Polesky Aff. Ex. 19 at 2. Valuing one's ownership interest is a proper purpose for seeking books and records. *See Somerville*, 2002 WL 1832830, at *8; *Madison Ave. Inv. P'rs, LLC v. Am. First Real Estate Inv. P'rs, L.P.*, 806 A.2d 165, 174 (Del.Ch.2002) (applying Section 17–305 of the Delaware Revised Uniform Limited Partnership Act). The purpose of evaluating "the status of the business and financial condition of Ohmite" reformulates this proper purpose in terms employed in the LLC Act. *See* 6 *Del. C.* § 18–305(a)(1) (providing that a member may obtain "information regarding the status of the business and financial condition of the limited liability company").

■ Investigating potential wrongdoing is also a proper purpose. *Somerville*, 2002 WL 1832830, at *3, *5 & n. 7 (holding that "investigat[ing] allegations of wrongdoing and mismanagement" was a proper purpose under Section 18–305); *accord Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 567 (Del.1997) (same, in corporate context). Wrongful dilution that benefits a majority holder is worthy of investigation. *Cf. Holman v. Nw. Broad., L.P.*, 2007 WL 1074770, at *3 (Del.Ch. Mar. 29, 2007) (noting that cases finding that investigation of mismanagement was a proper purpose frequently have "some element of self-dealing sufficiently demon-

strated"). The LLC Act provides explicitly that a member with a proper purpose may obtain "information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each member and which each member has agreed to contribute in the future." 6 *Del. C.* § 18–305(a)(5).

■ On the facts presented, Sanders has established "a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation." *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 123 (Del.2006); *see also JAKKS PACIFIC, Inc. v. THQ/JAKKS PACIFIC, LLC*, 2009 WL 1228706, at *5 (Del.Ch. May 6, 2009) (applying "credible basis" standard under Section 18–305). This standard does not mean the plaintiff must prove that misconduct has actually happened. *See Forsythe v. CIBC Empl. Private Equity Fund (U.S.) I, L.P.*, 2005 WL 1653963, at *5 (Del.Ch. July 7, 2005) ("While these facts fall well short of actually proving wrongdoing, they do provide a credible basis for inferring mismanagement. . . ."). Here, the dilative issuance suggests a possible breach of the duty of loyalty. Perhaps the issuance will prove justified. At present, Sanders needs only to have a credible basis to suspect wrongdoing, a standard that he readily meets. Regardless of whether he might someday be a proper plaintiff in a derivative action, Sanders is entitled to conduct his inspection to develop "an understanding of those activities." *Saito*, 806 A.2d at 117. He may "use information about . . . mismanagement in other ways," including to communicate with Ohmite management and determine whether to retain or dispose of his interest. *Id.*

## C. The Books And Records Are Reasonably Required To Fulfill The Stated Proper Purposes.

■ In addition to the proper purpose requirement, "the burden of proof is always on the party seeking inspection to establish that each category of the books and records requested is essential and sufficient to [that party's] stated purpose." *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del.1996); *see also Somerville*, 2002 WL 1832830, at *8 (applying "essential and sufficient" standard under Section 18–305).[2] The oddly juxtaposed adjectives "essential and sufficient" require that a plaintiff show that he actually needs a disputed category of books and records for an identified proper purpose. The bi-partite phrasing is strange because, if read literally, it suggests that access to books and records could be denied because the records requested were *insufficient*, *i.e.*, *less* than adequate to achieve the stated purpose.

■ The core inquiry in a books and records action is whether the requested documents are "reasonably required to satisfy the purpose of the demand." *Carapico v. Phila. Stock Exch., Inc.*, 791 A.2d

---

2. In our caselaw, the word "necessary" has sometimes replaced "essential." *See, e.g., Norfolk Cty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *5 (Del.Ch. Feb. 12, 2009) ("I must examine . . . the scope of the documents necessary and sufficient to address any proper purpose."). In fealty to the hoary legal tradition of belt-and-suspenders redundancy, both "necessary" and "essential" have been used on occasion. *See Saito*, 806 A.2d at 116 ("The scope of a stockholder's inspection . . . is limited to those books and records that are necessary and essential to accomplish the stated, proper purpose."); *BBC Acq. Corp. v. Durr–Fillauer Med., Inc.*, 623 A.2d 85, 88 (Del.Ch.1992) (stating standard as whether documents are "necessary, essential, and sufficient for the shareholders' purpose"). Subtle connotations aside, I regard the concepts as functionally synonymous for purposes of Section 220.

787, 793 (Del.Ch.2000). If the books and records are not "essential" for the stockholder's purpose, then the inspection can be denied as seeking materials beyond what is "needed to perform the task." *See, e.g., id.* (quoting *BBC Acq.*, 623 A.2d at 88). Conversely, if the stockholder already has "sufficient" information from other sources or as a result of other books and records requests, then the inspection similarly can be curtailed.[3]

Each of the categories of documents that Sanders seeks is reasonably required for him to carry out an inspection for the proper purposes set forth in his demand. Minutes of any membership or management meetings relating to the dilution, documents reflecting the number of new units issued and the consideration therefor, filings on Schedule K–1, and books and records about Horne and Sanders's opportunity to buy units at the same price, are necessary to evaluate whether the dilution was wrongful. Financial reports and tax returns dating back to July 2003 are necessary for Sanders to evaluate whether there were extenuating circumstances, such as impending bankruptcy, that required Ohmite to issue a large number of new units to an affiliate at a deep discount. Sanders does not have sufficient information available from other sources that might merit limiting or denying his inspection rights. Accordingly, Ohmite must provide Sanders with the books and records he has requested.

## III. CONCLUSION

For the foregoing reasons, summary judgment is entered in favor of the plaintiff and against the defendant. The parties shall submit an order, agreed as to form, within five business days. Costs are awarded to the plaintiff.

3. *See, e.g., Marathon P'rs, L.P. v. M & F Worldwide Corp.*, 2004 WL 1728604, at *8 (Del.Ch. July 30, 2004) (denying inspection for valuation purposes because plaintiff "presented no evidence showing that the publicly available information is insufficient to value its publicly traded shares"); *Radwick Pty. Ltd. v. Med., Inc.*, 1984 WL 8264, at *3 (Del. Ch. Nov.7, 1984) ("In deciding the extent of the stockholder's inspection rights, the Court should consider … the information previously provided by the company…."); R. Franklin Balotti & Jesse A. Finkelstein, 1 *The Delaware Law of Corporations and Business Organizations* § 7.47, at 7–102.4 (3d ed. Supp.2011) ("In determining whether to permit inspection (or the scope of any inspection), the court may examine the extent to which the corporation has previously furnished information (by public disclosure or otherwise) to stockholders.").