# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DALE RIKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0314-AGB |
| | ) | |
| TEUCRIUM TRADING, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 18, 2020
Date Decided: May 12, 2020

Michael F. Bonkowski and Andrew L. Cole, COLE SCHOTZ P.C., Wilmington, Delaware; Roger A. Lane and Courtney Worcester, FOLEY & LARDNER LLP, Boston, Massachusetts; *Attorneys for Plaintiff Dale Riker*.

T. Brad Davey and Mathew A. Golden, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Barry S. Pollack and Joshua L. Solomon, POLLACK SOLOMON DUFFY LLP, Boston, Massachusetts; *Attorneys for Defendant Teucrium Trading, LLC*.

**BOUCHARD, C.**

This post-trial opinion resolves the remaining issues in a books and records dispute between Teucrium Trading, LLC and its former CEO, Dale Riker. The company produced some documents to Riker within weeks of receiving his inspection demand, produced a substantial number of additional documents to him after engaging in a mediation, and produced certain other documents after trial. For the reasons discussed below, Riker has failed to establish an entitlement to receive any further documents in response to his broadly-worded demand except for a few specific items enumerated herein relevant to valuing his interest in Teucrium.

## I. BACKGROUND

The facts recited in this opinion are the court's findings based on the testimony and documentary evidence presented during a one-day trial held on November 19, 2019. The record includes stipulations of fact in the Pre-Trial Stipulation and Order, over 250 trial exhibits, four depositions, and live testimony from three fact witnesses.

### A. The Players

Defendant Teucrium Trading, LLC ("Teucrium" or the "Company") is a Delaware limited liability corporation with its principal place of business in Burlington, Vermont.[1] Teucrium is the sponsor of the Teucrium Commodity Trust,

---

[1] Pre-Trial Stipulation and Order ("PTO") ¶ II.A.15 (Dkt. 110). Citations to "Tr." refer to the Trial Transcript (Dkt. 123).

which holds five agriculturally-focused exchange-traded funds that are available on the New York Stock Exchange: the Teucrium Corn Fund, the Teucrium Sugar Fund, the Teucrium Soybean Fund, the Teucrium Wheat Fund, and the Teucrium Agricultural Fund (collectively, the "Trust" or the "Funds").[2]

Plaintiff Dale Riker ("Riker") holds 45.74% of the voting Class A units of Teucrium, which represents a 25% equity interest in Teucrium overall.[3] Riker served as the Chief Executive Officer of Teucrium from September 30, 2011 until September 17, 2018.[4] Sal Gilbertie is the current President and CEO of Teucrium.[5] He holds 45.74% of the voting Class A units and a 25% equity interest in Teucrium overall.[6] The remaining 8.52% of Class A units is held by Carl N. Miller III.[7]

## B. The Governance Dispute Between Riker and Gilbertie

Teucrium, which was founded in 2009, is governed by an Amended and Restated Limited Liability Company Agreement, dated as of October 26, 2009, which has been modified several times since (the "LLC Agreement").[8] Early on,

---

[2] PTO ¶ II.A.16; JX 229 at T001172.

[3] PTO ¶ II.A.18-19.

[4] *Id.* ¶ II.C.24-25.

[5] *Id.* ¶ II.D.26.

[6] *Id.* ¶ II.A.20.

[7] *Id.* ¶ II.A.21.

[8] JX 1.

Gilbertie was the President of the Company, Riker was Treasurer, and Miller was Secretary, a position he held until January 2010.[9]

On September 30, 2011, Riker became CEO of the Company.[10] During Riker's tenure as CEO, two other members of Riker's family joined Teucrium: Riker's wife, Barbara Riker, became Chief Financial Officer, and Riker's son, Brandon Riker, worked in the Company's trading operations.[11]

Under the LLC Agreement, the three Class A members are "equal in almost every respect" except that Gilbertie holds a veto right over many matters on which the approval of Class A members is necessary, including the removal or election of any officers of the Company.[12] In August 2018, Riker sought to effectively eliminate Gilbertie's veto right by proposing to operate the Company under a management group consisting of himself, his wife, and Gilbertie, who would make decisions by a simple majority vote.[13] This proposal understandably did not sit well with Gilbertie.

---

[9] Tr. 188 (Gilbertie); PTO ¶ II.A.22.

[10] PTO ¶ II.C.24.

[11] Tr. 51, 61 (Riker).

[12] Tr. 188 (Gilbertie); JX 1 Art. I (definition of "Majority Vote of the Class A Members"), § 8.1(b) (matters requiring approval by "Majority Vote of the Class A Members").

[13] JX 39 at T001272-74; Tr. 114-15 (Riker); Tr. 200-01 (Gilbertie).

On September 5, 2018, Gilbertie noticed a meeting of Class A members for September 10, 2018 to remove Riker and his wife as officers of the Company, but the meeting never occurred.[14] On September 6, Riker emailed Gilbertie to report that Steve Kahler, the Company's Chief Operating Officer, had resigned from the Company.[15] On September 11, Riker emailed "all employees" of the Company, stating that Brandon Riker had "assumed the position of Chief Operating Officer" after Kahler resigned.[16]

On or about September 13, 2018, Mrs. Riker and Brandon Riker resigned from their respective positions at Teucrium.[17] On September 17, Gilbertie and Miller, constituting a majority the Class A members, voted to remove Riker as CEO, to appoint Gilbertie as CEO and Secretary, and to appoint Cory Mullen-Rusin as Chief Financial Officer, Chief Accounting Officer, and Chief Compliance Officer.[18] Kahler later agreed to rejoin the Company as COO.[19]

---

[14] JX 53; Tr. 55 (Riker).

[15] JX 72; *see also* JX 75.

[16] JX 108.

[17] JX 123 at DR012243; Tr. 72 (Riker); *see* JX 125. In a letter confirming her resignation effective September 13, 2018, Mrs. Riker wrote that her "employment was constructively terminated without cause" the day before. JX 123 at DR012243.

[18] JX 129 at Riker_00000060; Tr. 149 (Mullen-Rusin). Previously, on August 16, 2018, Gilbertie and Miller had signed an amendment to the LLC Agreement purporting to remove Riker as CEO. JX 35 at T001288.

[19] *See* JX 145 at DR008761.

4

## C.    The Demand

On January 28, 2019, Riker made a demand on the Company to inspect fifteen categories of books and records under 6 *Del. C.* § 18-305 (the "Demand").[20] The Demand states three purposes:

- "[T]o investigate improprieties in corporate governance, regulatory compliance, reporting and controls, including but not limited to improperly noticed and conducted meetings to remove or appoint corporate officers, and the concerted action of a control bloc of Class A Members to remove [Riker] as an Officer and freeze [Riker] out as a Class A Member of the Company" (the "Governance Purpose").

- "[T]o investigate mismanagement, including mismanagement resulting in the loss, in the three months since [Riker's] forced separation from the Company in early September 2018, of approximately 2.1 million shares outstanding in the Teucrium funds, representing an approximately 10% decline in shares outstanding in only three months; the loss of approximately $21.1 million in assets under management by Teucrium, a decline of over 10% of the Company's assets in only three months; the Company's failure to achieve projected positive net income in each month from October 2018 through December 2018; and the troubling downward trajectory of the Company's performance overall since [Riker's] forced departure" (the "Financial Performance Purpose").

- "[T]o value [Riker's] substantial membership interest in the Company" (the "Valuation Purpose").[21]

On February 4, 2019, the Company, through its counsel (Vedder Price), responded to the Demand in a letter, stating that it disagreed that Riker had stated a

---

[20] PTO ¶ II.E.29; JX 194.

[21] JX 194 at 1.

5

proper purpose but that "the Company [was] willing to produce many of the requested documents."[22] The letter delineated the Company's position as to each of Riker's fifteen requests and explained which documents the Company would produce.[23] On February 19, Teucrium produced 262 pages of documents in response to the Demand.[24]

On February 26, 2019, Riker, through his counsel (Foley & Lardner LLP), sent a lengthy letter to Vedder Price acknowledging receipt of the documents that the Company had produced and demanding, among other things, that the Company search its electronic databases and produce numerous additional documents.[25] On March 22, 2019, Vedder Price sent a response to Foley & Lardner's February 26 letter.[26] Among other things, the letter stated that, although Riker could have been removed as CEO without cause, "it should be noted that Mr. Riker was indeed removed from the position of CEO for cause."[27] According to Riker, this was the first time he was informed that his removal was for cause.[28]

---

[22] JX 198 at DR014274-75.

[23] *See id.* at DR014275-78.

[24] PTO ¶ I.6.

[25] JX 201.

[26] JX 205.

[27] *Id.* at T000672.

[28] Tr. 74-75 (Riker).

## D. Procedural History

On April 26, 2019, Riker filed a complaint asserting two claims for the production of Company books and records under Teucrium's LLC Agreement (Count I) and under 6 *Del. C.* § 18-305 (Count II).[29]

In July 2019, the parties filed cross-motions for summary judgment,[30] which the court denied on August 5, 2019.[31]

On September 27, 2019, the parties participated in mediation before the Honorable Jack B. Jacobs.[32] As a result of the mediation, the Company agreed to produce documents in response to Request Nos. 1, 2, 4, and 12, and Riker withdrew Request Nos. 5 and 13.[33] Accordingly, after the mediation, nine of the fifteen requests in the Demand remained in dispute: Request Nos. 3, 6-11, 14, and 15.[34]

The court held a one-day trial on November 19, 2019. A significant amount of trial testimony concerned Riker's Financial Performance Purpose, which related to Request Nos. 9, 10, and 11. Riker did not address that purpose or any of the three requests relating to that purpose in his post-trial briefs and thus abandoned those

---

[29] Dkt. 1 ¶¶ 67-78.

[30] Dkt. 40; Dkt. 43.

[31] Dkt. 70.

[32] PTO ¶ I.11.

[33] Dkt. 105 ¶¶ 1, 6.

[34] PTO ¶ I.12.

7

issues.[35]  Riker also did not make any argument in his post-trial briefs that he is entitled to books and records under the LLC Agreement specifically.  Accordingly, judgment will be entered in Teucrium's favor on Count I of the complaint.[36]

## II.    ANALYSIS

Following trial, six requests in the Demand remained in dispute:  Request Nos. 3, 6, 7, 8, 14, and 15.  Two of these requests (Request Nos. 7 and 8) concern Riker's Valuation Purpose.  The remaining four requests (Request Nos. 3, 6, 14, and 15) concern his Corporate Governance Purpose.  The court analyzes the issues concerning these two categories, respectively, in Parts II.B and II.C, after summarizing the generally applicable legal standards in Part II.A.

### A.    Legal Standards

Section 18-305 of the Limited Liability Company Act affords members of a Delaware limited liability company the right to obtain from the company certain records "upon reasonable demand for any purpose reasonably related to the member's interest as a member of the limited liability company."[37]  Section 18-305 requires that any such demand "shall be in writing and shall state the purpose of the

---

[35] *See Oxbow Carbon & Mineral Hldgs., Inc. v. Crestview-Oxbow Acq.*, *LLC*, 202 A.3d 482, 502 n.77 (Del. 2019) ("The practice in the Court of Chancery is to find that an issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial.").

[36] *See id.*

[37] 6 *Del. C.* § 18-305(a).

8

demand."[38] There is no dispute that Riker complied with these form and manner requirements.

"Delaware courts have interpreted Section 18-305 by looking to cases interpreting similar Delaware statutes concerning corporations and partnerships," such as Section 220 of the Delaware General Corporation Law.[39] "To inspect books and records, a member of a Delaware LLC, like a stockholder of a Delaware corporation, must first establish by a preponderance of the evidence the existence of a proper purpose for inspection. A proper purpose is one that is reasonably related to such person's interest as a member . . . ."[40] "[O]nce a proper purpose has been established, any secondary purpose or ulterior motive of the stockholder becomes irrelevant."[41]

After a proper purpose has been established, the scope of a stockholder's inspection is "limited to those books and records that are necessary and essential to accomplish the stated, proper purpose."[42] A stockholder thus must "make specific

---

[38] 6 *Del. C.* § 18-305(e).

[39] *Sanders v. Ohmite Hldgs., LLC*, 17 A.3d 1186, 1193 (Del. Ch. 2011) (internal quotations omitted).

[40] *Id.* (internal quotations omitted).

[41] *CM & M Gp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982).

[42] *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del. 2002).

and discrete identification, with rifled precision, of the documents sought."[43] "The burden of proof is always on the party seeking inspection to establish that each category of the books and records requested is essential and sufficient to [that party's] stated purpose."[44] The Court of Chancery "has wide latitude in determining the proper scope of inspection."[45]

## B. The Valuation Purpose

It is well established that "[v]aluing one's ownership interest is a proper purpose for seeking books and records."[46] Riker testified credibly that he was looking to value his interest in Teucrium to determine whether to sell or hold his shares in light of the Company's "deteriorating financial performance" and what he perceives to be "erratic decision-making" at the Company.[47] Riker also testified credibly that he plans to value Teucrium using the discounted cash flow ("DCF") method, which he has done before and has the expertise to perform.[48] Thus, Riker

---

[43] *Brehm v. Eisner*, 746 A.2d 244, 266 (Del. 2000).

[44] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996).

[45] *Sec. First Corp. v. U.S. Die Casting and Dev. Co.*, 687 A.2d 563, 569 (Del. 1997).

[46] *Sanders*, 17 A.3d at 1193 (citations omitted); *see also Schoon v. Troy Corp.*, 2006 WL 1851481, at *2 (Del. Ch. June 27, 2006) (valuing shares is a proper purpose for a Section 220 demand).

[47] Tr. 22-23 (Riker).

[48] *Id.* 24, 26.

has demonstrated a proper purpose for requesting documents pertaining to his Valuation Purpose.

Teucrium does not dispute as a general matter Riker's professed desire to value his interests in the Company or that Riker is capable of doing so through a DCF analysis. Rather, the gravamen of Teucrium's opposition is that Riker "does not identify and explain with specificity how any particular piece of supposedly missing financial information would likely constitute a material part of his planned calculation."[49] Thus, the issue before the court is whether the records Riker seeks "are necessary and essential to" value his interests in Teucrium.[50]

Request Nos. 7 and 8 of the Demand are relevant to Riker's Valuation Purpose.[51] Those requests seek records containing the following information:

> 7. True and full information regarding the status of the *financial condition* of the Company within the meaning of 6 *Del. C.* § 18-305(a)(1) and (5), from and after August 1, 2018, including without limitation (i) true and full information sufficient to show the allocation of all items of income and expense between and among the Company and the Teucrium funds (i.e., CORN, WEAT, SOYB, CANE, TAGS), (ii) true and full information to show the current and projected cash position of the Company over the next twelve (12) months, including whether the Company is or is not presently considered by its internal finance team, or by its outside auditors, to be a going concern.

---

[49] Def.'s Br. 29 (Dkt. 127).

[50] *Saito*, 806 A.2d at 116.

[51] Riker testified that Request Nos. 9-11 also relate to his Valuation Purpose. Tr. 25 (Riker); *see id.* 35-36. As noted above, however, those requests, which on their face concerned Riker's Financial Performance Purpose, were abandoned. *See* Part I.D.

11

8. True and full information regarding the status of the *business* of the Company within the meaning of 6 *Del. C.* § 18-305(a)(1), from and after August 1, 2018, including without limitation the Company's plans or projections, if any, for expanding the outstanding shares of its funds, increasing the Company's assets under management, and/or restoring the Company to profitability.[52]

Riker more specifically identified at trial five types of information about Teucrium he says he needs to prepare a DCF analysis: (i) gross expenses, (ii) contingent assets and liabilities, (iii) net operating loss carryforward, (iv) cash projections, and (v) management's assessments of Teucrium as a going concern.[53] The court will address Riker's requests for each of these items, in turn, below.

### 1. Gross Expenses

Request No. 7 (quoted above) seeks, among other things, "information sufficient to show the allocation" of expenses between the Company and the Funds.[54] Riker amplified at trial that his need for expense information includes "any waived and reimbursed expenses," meaning expenses (such as management fees) charged to the Funds that the Company waives or for which it does not seek reimbursement.[55]

---

[52] JX 194 at 2.

[53] Tr. 25 (Riker).

[54] JX 194 at 2.

[55] Tr. 16-18, 27 (Riker).

12

After taking a reasonably targeted approach in his Demand with respect to the amount of expense information he needs to value his interest in Teucrium, Riker broadened his demand for expense information dramatically in his post-trial brief, where he contends that the Company's "allocation model is necessary and essential for him to conduct a DCF valuation."[56] The Company's allocation model is an Excel-based workbook that is manually updated on an ongoing basis.[57] It is dynamic in nature and contains granular details concerning each specific expense of the Company and the Funds.[58]

Teucrium objects to producing the allocation model because it exceeds the scope of Riker's Demand and is not necessary for his stated purpose of valuing his interest. Teucrium further contends that all the expense information Riker needs to prepare a DCF analysis is contained in the Company's audited financial statements, which the Company provides to the Class A members annually. The court agrees with Teucrium on the expense issue.

Grant Thornton LLP annually audits the combined financial statements for the Company and the Funds.[59] In June 2019, the same day it received its last set of

---

[56] Pl.'s Opening Br. 16 (Dkt. 124).

[57] *See* JX 31; Tr. 13-14 (Riker).

[58] Tr. 13-14 (Riker).

[59] Tr. 152 (Mullen-Rusin).

13

audited financial statements from Grant Thornton, the Company provided a copy of those statements to Riker.[60] They contain for each of the past three years (2016, 2017, and 2018) the (i) combined expenses of the Company and the Funds broken down into eight categories, (ii) how those expenses were allocated between the Company and the Funds by category, and (iii) the amount of management fees charged to the Funds that the Company waived.[61] The Company further represents it will provide Riker with a copy of its 2019 audited financial statements when they come out, which is expected to occur in June or July.[62]

Once the 2019 financial statements are produced to Riker, the Company will have provided Riker with its most recent four years of historical expense information broken down by category and allocated between the Company and the Funds. In my opinion, this information fully satisfies what Riker actually sought in Request No. 7 and should be more than sufficient for Riker, who claims to be experienced in preparing his own DCF models, to project expenses for purposes of valuing his interests in the Company.[63] No basis exists to require the Company to produce its

---

[60] *Id.* 153.

[61] JX 229 at T001169, T001179, T001189-91.

[62] Post-Trial Tr. 28-29.

[63] Riker testified that he needs to know which expenses were "one-time or ongoing" and which were "fixed versus variable." Tr. 27 (Riker). But Riker made no effort at trial to satisfy his burden of demonstrating why this information is essential to value his interest. *See Thomas & Betts Corp.*, 681 A.2d at 1035 ("The plaintiff bears the burden of proving

14

allocation model to Riker. Riker did not ask for the model until after trial and the information in the model, which changes constantly and is highly granular, far exceeds what Riker sought in his Demand and what is necessary for him to value his interest.

### 2. Contingent Assets and Liabilities

With respect to his request for information regarding Teucrium's contingent assets and liabilities, Riker testified: "[I]f there's a contingent liability, then the valuation would be reduced. And if there's a contingent asset, then the valuation would be increased."[64] Riker testified further that this information can be found in prepaid memoranda that the Company prepares on a quarterly basis.[65] Riker contends that "in order to conduct a meaningful DCF valuation, [he] is entitled to the quarterly prepaid memorandum generated since he was removed from his position as CEO," in September 2018.[66]

---

that each category of books and records is essential to accomplishment of the stockholder's articulated purpose for the inspection."). In my view, four years of historical expense information broken out by category and allocated between the Company and the Funds should provide Riker, who served as the Company's CEO for seven years and is intimately familiar with its operations, sufficient information to account for any meaningful variations in expenses for purposes of preparing a projection to use in a DCF analysis.

[64] Tr. 28 (Riker).

[65] *Id.* 27-28.

[66] Pl.'s Opening Br. 18.

The Company does not dispute that contingent asset and liability information may be useful to value one's interest in the Company. Rather, the Company contends that production of the prepaid memoranda—which are full of line item details irrelevant to valuing one's interest[67]—is unnecessary because the amount of the Company's and the Funds' contingent assets and liabilities are set forth in the Company's financial statements, which have been provided to Riker. The Company also points out that these amounts are immaterial in any event. The court agrees with the Company on this issue.

At trial, Mullen-Rusin testified that the Company's "financial statement of condition" reflects its contingent assets in a line item for "other assets" and its contingent liabilities in a line item for "other liabilities."[68] Those statements for 2017 and 2018 indicate, moreover, that the amount of contingent assets and liabilities at issue were immaterial. For example, as of December 31, 2017, the amount of "other assets" reported for Teucrium and the Funds were $3 and $6,748, respectively, and the amount of "other liabilities" were zero and $99,909, respectively.[69] Similarly, as of December 31, 2018, the amount of "other assets" reported for Teucrium and the Funds were zero and $24,455, respectively, and the

---

[67] *See, e.g.*, JX 24.

[68] Tr. 155 (Mullen-Rusin).

[69] JX 229 at T001188.

amount of "other liabilities" were zero and $109,342, respectively.[70] Each of these figures represent a small fraction of the "total assets" or "total liabilities" for the Company or the Funds as of those dates.[71]

Given the insignificant amounts reflected in the 2017 and 2018 financial statements, the amounts of Teucrium's contingent assets and liabilities do not appear to be necessary and essential for Riker to value his interest in Teucrium. In any event, Riker can obtain this information from the audited financial statements for the Company and the Funds that are in his possession and that he will receive in the near future for Company's 2019 fiscal year. Accordingly, the Company need not produce its prepaid memoranda in response to the Demand.

### 3. Net Operating Loss Carryforward

Riker seeks documents showing Teucrium's net operating loss carryforward balance because, as he testified at trial, the balance "[e]ssentially . . . shields future net income, thereby increasing cash flow, thereby increasing valuation."[72] More

---

[70] *Id.* at T001187.

[71] *See* JX 229 at T001188 (reflecting that, as of December 31, 2017, the "total assets" reported for Teucrium and the Funds were $523,155 and $148,849,581, respectively, and the "total liabilities" were $176,747 and $5,902,829, respectively); *see id.* at T001187 (reflecting that, as of December 31, 2018, the "total assets" reported for Teucrium and the Funds were $700,887 and $170,816,907, respectively, and the "total liabilities" were $284,732 and $20,565,747, respectively).

[72] Tr. 28 (Riker).

specifically, Riker seeks "Item L" of Schedule K-1 for Teucrium's 2018 tax return on Form 1065.[73] Teucrium agreed during post-trial argument to produce this information to Riker, which moots this issue.[74]

### 4. Cash Projections

Riker testified that he needs the Company's cash projections to "understand management's perspective on Teucrium's future" in order to value his interest in the Company."[75] This information is found in the Company's budget or business plan.[76]

In response to Riker's trial testimony, Teucrium produced to Riker after trial part of its 2020 budget that shows month-by-month the Company's projected net income and cash flows for its 2020 fiscal year.[77] Unsatisfied, Riker argues he is entitled to receive the full budget or business plan.[78]

Request No. 8 of the Demand seeks the "Company's plans or projections, if any, for expanding the outstanding shares of its funds, increasing the Company's assets under management, and/or restoring the Company to profitability." [79]

---

[73] Post-Trial Tr. 30-31, 35, 41; *see also* JX 13 at DR001311.

[74] *See* Post-Trial Tr. 45-46.

[75] Tr. 29-30 (Riker).

[76] *Id.* 29.

[77] *See* Golden Aff. Ex. 2 (Dkt. 127).

[78] Post-Trial Tr. 47-48.

[79] JX 194 at 2.

18

Although Riker did not specifically address this aspect of his Demand at trial, this request is reasonably targeted and, if such plans or projections exist, they would be important to valuing Riker's interests because what an investor "cannot hope to do is [to] replicate management's inside view of the company's prospects."[80] Accordingly, to the extent that other parts of the Company's 2020 budget address expanding the outstanding shares of the Funds, increasing the Company's assets under management, or restoring the Company to profitability, the Company must produce those parts of the 2020 budget to Riker.

### 5. Going Concern Analysis

Request No. 7 of the Demand seeks information concerning "whether the Company is or is not presently considered by its internal finance team, or by its outside auditors, to be a going concern."[81] Riker testified that he needs this information to "determine the appropriate and applicable discount rate for the discounted cash flow" analysis, particularly in light of reductions to the federal discount rate that occurred from August to October 2019, which may have impacted the Company's revenues and its going concern analysis.[82]

---

[80] *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 203 (Del. Ch. 2007) (Strine, V.C.).

[81] JX 194 at 2.

[82] Tr. 25, 30-31 (Riker).

Riker has management's going concern analysis that was provided as part of its 2018 audited financial statements, which he received in June 2019.[83] As noted above, he also will receive in the near future the Company's audited financial statements for 2019 and management's going concern analysis therein. Although Gilbertie and Mullen-Rusin both testified at trial, Riker did not ask either of them whether the Company has any intention to provide a going concern analysis before then. Accordingly, there is no evidence in the record of any additional information the Company could provide at this time with respect to its status as a going concern.

* * * * *

In sum, for the reasons explained above, the Company has no obligation to produce additional documents in response to Riker's Valuation Purpose except for "Item L" of Schedule K-1 for Teucrium's 2018 tax return and the items specifically referenced above concerning the Company's 2020 budget.

---

[83] Tr. 31 (Riker); JX 229 at T001179 ("Management of [Teucrium] believes that its cash resources in addition to the anticipated cash to be provided by the current operations and management of the Trust, will be sufficient to meet its current obligations and fund its operations to at least one year after the date on which the financial statements became available for issuance.").

20

## C.    The Governance Purpose

Request Nos. 3, 6, 14, and 15 concern Riker's Corporate Governance Purpose. Those requests seek records containing the following information:

3.    Documents relating to the potential or actual appointment or removal of any company Officer, at any time from and after July 1, 2018 to date, including any email communications.

6.    All correspondence and communications between [Gilbertie] and [Miller], constituting a control bloc of the Company's voting Class A membership interests (the "Control Bloc"), regarding any action taken by the Control Bloc, or proposed, considered, noted, or otherwise mentioned or discussed by the Control Bloc, regarding any Company-related matter, including without limitation the Class A Meetings, the appointment or removal of any company Officer, or any other Company matter.

14.    Any documents, information or other materials, of any kind whatsoever, that were distributed or otherwise made available to any Advisory Board or other governing group of the Company, at any time from and after September 1, 2018, including without limitation any oral or written reports of management, and Partner Highlights, and any notes or drafts thereof.

15.    Any decision or other action taken by any Advisory Board or other governing group of the Company, at any time from and after September 1, 2018.[84]

Under Delaware law, an investor seeking to inspect documents for the purpose of investigating potential mismanagement "need only show, by a preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is

---

[84] JX 194 at 2-3.

possible mismanagement that would warrant further investigation."[85] "That threshold may be satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[86] Although "credible basis" is the lowest burden of proof recognized in our law, "it still requires a plaintiff to provide '*some* evidence' of wrongdoing."[87] "Mere disagreement with a business decision is not enough."[88]

Riker's devotes thirty-four pages of his post-trial brief explaining why he believes he "has credible bases to investigate irregularities in Teucrium's corporate governance practices" due to breaches of fiduciary duty by Gilbertie, as an officer,

---

[85] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 123 (Del. 2006); *see also Aloha Power Co., LLC v. Regenesis Power, LLC*, 2017 WL 6550429, at *4 (Del. Ch. Dec. 22, 2017) (applying the credible basis standard in the context of a Section 18-305 demand); *Sanders*, 17 A.3d at 1194 (same); *JAKKS PACIFIC, Inc. v. THQ/JAKKS PACIFIC, LLC*, 2009 WL 1228706, at *5 (Del. Ch. May 6, 2009) (same).

[86] *Seinfeld*, 909 A.2d at 123 (internal quotations omitted).

[87] *Hoeller v. Tempur Sealy Int'l, Inc.*, 2019 WL 551318, at *7 (Del. Ch. Feb. 12, 2019) (emphasis added) (quoting *Seinfeld*, 909 A.2d at 118); *see also Paraflon Invs., Ltd. v. Linkable Networks Inc.*, 2020 WL 1655947, at *5 (Del. Ch. Apr. 3, 2020) (no credible basis of wrongdoing in sale of defendant because the record "is devoid of evidence that [defendant's founder] dominated or controlled the Board"); *High River Limited P'ship v. Occidental Petroleum Corp.*, 2019 WL 6040285, at *5 (Del. Ch. Nov. 14, 2019) (no credible basis of wrongdoing in various transactions because plaintiffs "have not alleged, much less proven, that the [defendant's] board was conflicted, disloyal or in some way interested in the transactions at issue"); *City of Westland Police & Fire Ret. Sys. v. Axcelis Techs., Inc.*, 1 A.3d 281, 289 (Del. 2010) (no credible basis of wrongdoing in defendant's handling of acquisition proposals and director resignations because record does not provide any inferences that the challenged actions were not good faith business decisions).

[88] *High River*, 2019 WL 6040285, at *5 (citing *Deephaven Risk Arb. Trading Ltd. v. UnitedGlobalCom, Inc.*, 2005 WL 1713067, at *8 (Del. Ch. July 13, 2005)).

controlling stockholder, and/or member of a control group with Miller.[89]  The brief

is long on rhetoric but provides scant evidence to justify the extraordinary breadth

of the documents Riker seeks in Request Nos. 3, 6, 14, and 15.

The main point of contention in Riker's brief concerns his removal as CEO

on September 17, 2018, which Riker understood to be without cause until a lawyer

representing the Company stated in a March 2019 letter to his counsel that the

removal was "for cause."[90]  But this issue is moot.  Before trial, the Company

represented it had provided to Riker in response to Request Nos. 3 and 6 "all

responsive information concerning the appointment or removal of Dale Riker as

CEO and Steve Kahler as COO (including text messages and emails between Class

A Members)."[91]  Mullen-Rusin confirmed at trial the searches the Company

conducted and what it produced in response to these (and all of the other) requests

in the Demand.[92]

---

[89] Pl.'s Opening Br. 23-57.  The LLC Agreement does not eliminate the fiduciary duties of members and/or officers but does limit their personal liability for damages.  *See* JX 1 § 8.10.

[90] Tr. 73-75 (Riker): JX 205 at T000672.

[91] Def.'s Pre-Trial Br. 27 (Dkt. 101).

[92] Tr. 167-72 (Mullen-Rusin).

Post-trial, Riker's document demands concerning his removal as CEO boiled down to three items he thought might exist.[93] As to those items, the Company explained to the court's satisfaction that it had searched for but not found any responsive, non-privileged documents to produce.[94] Thus, the Company does not need to take any further action concerning Riker's request for documents relating to his removal as CEO.

Apart from seeking documents concerning Riker's removal as CEO, Request No. 3 seeks documents relating to "the potential or actual appointment or removal" of any other Company officer from and after July 1, 2018. According to Riker, simply making this request entitles him to documents concerning the removal of Mrs. Riker and Kahler and the appointment of Gilbertie, Kahler and Mullen-Rusin to new positions during this period.[95] The court disagrees. Request No. 3 may seek those documents, but Riker failed to identify—as he must—*any* evidence of record

---

[93] Post-Trial Tr. 79-82.

[94] *Id.* 89-90; *see also* Def.'s Br. 41-42 n.10 ("Teucrium has produced to Mr. Riker all materials that it located concerning the removal of him and Mr. Kahler.").

[95] Pl.'s Reply Br. 29-30 (Dkt. 130). As noted above, the Company represented it produced to Riker documents concerning Kahler's removal as COO. The Company also produced to Riker copies of separation agreements between the Company and Mrs. Riker and Brandon Riker. Tr. 168 (Mullen-Rusin); JX 156; JX 157. Riker contends that Brandon Riker was never an officer of Teucrium. Pl.'s Reply Br. 30 n.19. But whether or not he was, Riker has not identified any evidence to establish a credible basis of corporate wrongdoing in connection with Brandon Riker's separation from the Company.

to establish a credible basis that any of those events involved corporate wrongdoing.[96]

Riker similarly has not identified any evidence to establish a credible basis of corporate wrongdoing with respect to any of the other matters for which he seeks documents in Request Nos. 6, 14, and 15. To repeat, these broadly-worded requests seek, irrespective of subject matter, documents concerning, among other things, (i) any actions taken or considered by Gilbertie and Miller as a putative "control bloc" or (ii) any information made available to, or action taken by, "any Advisory Board or other governing group of the Company."[97] Putting aside documents concerning Riker's removal as CEO, which the Company produced to him voluntarily, Riker has not identified any evidence to demonstrate that credible or legitimate issues of wrongdoing exist concerning any other actions taken or considered by the putative "control bloc" or involving any other "governing group" of the Company.

---

[96] Riker suggests in a footnote he made this showing with respect to Mrs. Riker because the Company stated before trial in opposing a motion *in limine* that she was "fired" when, in actuality, she resigned as CFO. Pl.'s Opening Br. 43 n.26 (citing Dkt. 93 ¶ 6). This statement is not part of the trial record. Even if it were, it is insufficient to demonstrate a credible basis of corporate wrongdoing with respect to Mrs. Riker's termination as CFO.

[97] JX 194 at 2-3.

Finally, Riker contends that he is entitled to documents based on the fact that Mullen-Rusin filed two documents with the National Futures Association ("NFA") on September 28, 2018, stating erroneously that Riker was no longer a principal and was an indirect (rather than a direct) owner of Teucrium.[98] Mullen-Rusin credibly testified that these errors were honest mistakes of a clerical nature she made when "using the [NFA] online registration system" for the first time.[99] Significantly, she corrected both errors promptly after discovering them.[100] Putting aside whether any documents would even exist concerning making these online changes, Riker has failed to show a credible basis to believe that Mullen-Rusin was engaged in any wrongdoing.

* * * * *

In sum, putting aside the Company's voluntary production of documents responsive to Request Nos. 3 and 6, Riker has not established a proper purpose to inspect documents concerning any of the other matters falling within Request Nos. 3, 6, 14, and 15 of his Demand.

---

[98] JX 137 at Riker_00000052; JX 151 at Riker_00000057.

[99] Tr. 165-66. (Mullen-Rusin).

[100] *Id.*

## D. Riker is Not Entitled to Attorneys' Fees

Riker seeks an award of attorneys' fees for allegedly vexatious litigation tactics.[101] He contends, in particular, that he and "his family have been subject to extended personal attacks" during the course of this litigation.[102]

"Delaware follows the 'American Rule,' whereby a prevailing party is generally expected to pay its own attorney's fees and costs."[103] Delaware recognizes "limited equitable exceptions to that rule," such as "where the losing party has acted in bad faith in opposing the relief sought in the lawsuit."[104] The "bad faith" exception is deployed only in "extraordinary circumstances as a tool to deter abusive litigation and to protect the integrity of the judicial process."[105] This is not one of those cases.

To begin, except with respect to two narrow issues pertaining to his Valuation Purpose, Riker did not prevail at trial. The significant majority of his document requests that remained for trial have been rejected by the court.

---

[101] Pl.'s Opening Br. 61-62.

[102] Pl.'s Reply Br. 32-33 n.22.

[103] *Montgomery Cellular Hldg. Co., Inc. v. Dobler*, 880 A.2d 206, 227 (Del. 2005).

[104] *Id.*; *McGowan v. Empress Ent., Inc.*, 791 A.2d 1, 4 (Del. Ch. 2000).

[105] *Montgomery*, 880 A.2d at 227 (internal quotations omitted).

More broadly, both sides fought hard in this litigation. Riker, for example, filed a motion for summary judgment even though the *bona fides* of his multiple inspection purposes was at issue,[106] and three non-meritorious motions *in limine*.[107] The Company was equally aggressive in its litigation defense, but also made efforts to resolve the issues amicably by producing some documents within weeks of the Demand and many more through mediation. This is simply not one of those "extraordinary circumstances" where one side's conduct warrants shifting fees. Accordingly, Riker's request for an award of attorneys' fees is denied.

## III. CONCLUSION

The parties are directed to confer and submit an implementing order within five business days. The order should provide that any documents produced as result of this opinion will be governed by the same confidentiality protections that govern the documents the Company previously produced to Riker in response to his Demand.

**IT IS SO ORDERED.**

---

[106] Dkt. 43.

[107] Dkt. 78; Dkt. 79; Dkt. 80.