# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MICHAEL B. GARNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-0782-SEM |
| | ) | |
| AUTHENTICITY.AI INVESTORS, LLC | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Report: March 31, 2025
Date Submitted: March 5, 2025

## POST-TRIAL REPORT

Thomas A. Uebler, Sarah P. Kaboly & Allison Neff, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, DE; *Counsel for Plaintiff*.

Michael W. McDermott, David B. Anthony, Harry W. Shenton, IV & Charmi A. Patel, BERGER MCDERMOTT LLP, Wilmington, DE; *Counsel for Defendant*.

**MOLINA, Senior Magistrate**

Through this action, an investor seeks inspection of thirty categories of books and records related to the closely held company in which he invested. He identifies two distinct purposes, relying heavily on his first: valuation. For any categories of documents nonessential to his valuation purpose, he directs me to a secondary, catchall purpose to "investigat[e] mismanagement, waste, wrongdoing, self-dealing, improper transactions, and/or the independence of directors."

The company contests the propriety of either purpose. For valuation, the company argues the investor already has sufficient information to value his investment, vitiating the need for a court-ordered production. For investigation, the company contends the investor lacks genuine concerns and is, instead, on a fishing expedition.

The company's position is well taken. The investor's demand is broad, and his purposes appear shallow in comparison. Yet, for the reasons I will explain, I recommend that the company be ordered to produce a very limited subset of books and records to assist the investor in valuing his interests, and to investigate the discrepancy in the shares the company's related entity is apparently authorized to issue, versus what it has purported to issue. The remainder of his request, however, should be denied. The parties should bear their own fees, though costs should be shifted in the company's favor.

This is my post-trial report.

## I. BACKGROUND

The following facts are drawn from the parties' stipulations in the pre-trial order, eighty-two joint exhibits (including two deposition transcripts), argument presented at our half-day paper-record trial on February 20, 2025, and the parties' post-trial chart (addressed further below) submitted on February 28, 2025.[1]

### A. The Defendant's Business

The defendant, Authenticity.AI Investors, LLC (the "Defendant"), was formed in 2019 as a "feeder entity that serves to aggregate investments" while maintaining no "business operations, financials, etc. of its own."[2] Upon formation, the Defendant began soliciting investors to raise funds, which it ultimately used to

---

[1] *See* Docket Item ("D.I.") 50 ("Pretrial Order"), 68 ("Tr."). The parties' jointly submitted exhibits are cited as "JX__." Although the parties separately lodged the deposition transcripts of Messrs. Michael Garner (the "Plaintiff") and Alex Gregor (D.I. 58), I cite to each by its joint exhibit number (JX070 and JX072, respectively).

Before trial, I addressed a couple of evidentiary issues and left one open for later adjudication. *See* D.I. 57 ("Pretrial Conference Tr."). The remaining issue was the admissibility of Mr. Gregor's deposition testimony regarding the valuation of Mr. Michael McDonald's share of Authenticity.AI Corporation. I find the testimony admissible. It falls within the broad topics for Mr. Gregor's 30(b)(6) deposition. *See* D.I. 29, Sch. A (listing deposition topics). And the questioning was not so argumentative that the testimony is inadmissible. *See, e.g.*, JX072 at 94:13–21 (Mr. Gregor admitting that he is "perfectly capable of standing as a corporate representative and stating what happened as it relates to what documents and information was available as it related to the transaction itself"). Accordingly, the objection is overruled, and the contested testimony is admitted. I grant the evidence before me the weight and credibility I find it deserves.

[2] JX031 at 1.

purchase stock in Authenticity.AI Corporation ("Authenticity Corp.").[3] Authenticity Corp. is "a platform that uses artificial intelligence for language translation and speech-to-text processing of audio and video formats, intended to support the legal, regulatory, and compliance industries."[4]

The plaintiff, Michael B. Garner (the "Plaintiff") was one of the roughly ten investors who invested in the Defendant to support its interest in Authenticity Corp. On August 12, 2019, the Plaintiff made a capital contribution of $125,000 to the Defendant, at which point he became a membership unit owner.[5] With the other investors, including Knox Capital,[6] the Defendant raised $1,275,000, which was used to purchase Authenticity Corp. stock.[7]

Authenticity Corp. stock remains the Defendant's only asset,[8] and the Defendant derives value for its investors solely from Authenticity Corp.'s

---

[3] Pretrial Order at p. 23 ¶¶ 3–4. Although at various times Authenticity Corp. was referred to as "Authenticity Inc.," the parties clarified at our pretrial conference that Authenticity Corp. is the relevant entity. Pretrial Conference Tr. at 36:17–37:17.

[4] Tr. at 13:7–11.

[5] Pretrial Order at p. 23 ¶ 3. The Plaintiff's investment initiated his 9.80% ownership of the Defendant. *See* JX036 at 1 (reflecting the Plaintiff's eventual 9.80% ownership).

[6] *See id.* (reflecting the Defendant's cap table with named investors, including "Knox Capital"). Per the Plaintiff, Knox Capital is a small private equity firm run out of Chicago, Illinois by Messrs. Bryant and Gregor. D.I. 40 at 1–2.

[7] Pretrial Order at p. 23 ¶¶ 3–4.

[8] *Id.* ¶ 5.

performance.[9] This performance is tracked and gauged through less-than-formal means. Neither the Defendant nor Authenticity Corp. have held any annual board meetings,[10] and the Defendant does not keep paper records or have corporate document maintenance or retention policies or procedures.[11] The Defendant also has failed to maintain board minutes or other formal board materials.[12]

But the Defendant's, and Authenticity Corp.'s, founders and day-to-day operators are known. Michael McDonald formed and founded Authenticity Corp. and served as its CEO until March 1, 2024.[13] As of that day, however, Mr. McDonald was neither the CEO of Authenticity Corp., nor a member of its board of directors.[14]

---

[9] JX072 at 37:18–20. As I cite to Mr. Gregor's deposition testimony, I pause to note the Defendant's counsel objected a borderline-obstructive number of times; my law clerk counted over two hundred and seventy-five (275) objections during the five-hour (including breaks) deposition. Many of the objections appear baseless and reflect conduct unbecoming of members of the Delaware bar. *See, e.g.*, *id.* at 8:20–10:16 (objecting to the form of an administrative question asking the deponent what time he needed to leave the deposition to travel home). The objections are overruled.

[10] *Id.* at 55:9–11, 56:7–9.

[11] *Id.* at 22:21–32:5. In fact, Mr. Gregor frequently testified to there being no paper record of various documents, explaining that they were either maintained "via e-mail with a file folder designated for Authenticity or on . . . an Office 365 shared drive[,]" with email correspondence simply kept in inboxes. *Id.* at 25:15–31:12.

[12] *Id.* at 118:3–5, 120:3–7.

[13] Pretrial Order at p. 26 ¶ 21.

[14] *Id.* ¶ 23.

Alex Gregor and Michael Bryant have been both the managers of the Defendant, and sitting on the board of directors for Authenticity Corp., at all relevant times.[15]

B.     Authenticity Corp.'s Ownership

The Plaintiff's quest for books and records to value his interest in the Defendant requires a close look at Authenticity Corp. As addressed, the Plaintiff was among investors who contributed toward the Defendant's purchase of Authenticity Corp. stock. But the level or value of the Defendant's stock ownership, from the Plaintiff's perspective, is unclear.

Authenticity Corp.'s amended and restated certificate of incorporation dated August 23, 2019, reflects that it was authorized to issue up to 250,000 shares of stock, 200,000 of them being "Common Stock," and 50,000 of them being "Preferred Stock," with the first series of Preferred Stock, designated as "Series A Preferred Stock," consisting of 17,500 shares.[16] A certificate shows that on the same day (August 23, 2019) there was an issuance of 8,750 shares, apparently to the Defendant,[17] though the Plaintiff contends he does not have sufficient information to corroborate this.[18] Schedule B to Authenticity Corp.'s shareholders agreement

---

[15] *Id.* at p. 24 ¶ 6. From October 2019 through February 2024, the three members of Authenticity Corp.'s board of directors were Messrs. Gregor, Bryant, and McDonald. *Id.* at p. 26 ¶ 22.

[16] JX007 at 3.

[17] JX012 at 2; *see* Pretrial Order at p. 24 ¶ 9.

[18] D.I. 40 ("Pl.'s Op. Br.") at 9–10.

seems to reflect that the Defendant held 10,937.5 shares of Preferred Stock as of October 1, 2019,[19] though the Plaintiff again contends he cannot confirm this.[20] Then, Authenticity Corp.'s September 11, 2020 stock certificate shows that 22,312.4833 shares of Series A Preferred Stock were issued to Authenticity LLC,[21] which the Defendant again contends cannot be confirmed.[22] The importance of the discrepancy in Series A Preferred Stock owned is addressed more fully below.

On or around March 1, 2024, Mr. McDonald sold all of his Authenticity Corp. common stock, a total of 63,538.13 shares, to the Defendant for $15,000 (the "Stock Purchase Agreement").[23] As a result of the Stock Purchase Agreement, the Defendant became Authenticity Corp.'s 90.3% controlling stockholder.[24] In connection therewith, the Plaintiff (along with the other investors) received an email informing him that Authenticity Corp. was "insolvent and largely inactive[,]" and providing him with two choices—either up his investment with the $15,000 purchase

---

[19] JX008 at 17.

[20] Pl.'s Op. Br. at 10.

[21] Pretrial Order at p. 24 ¶ 9; JX012.

[22] Pl.'s Op. Br. at 10.

[23] Pretrial Order at p. 26 ¶ 24. How that $15,000 number came to be is not entirely clear; Mr. Gregor testified at his deposition that the amount was "what [Mr. McDonald] said he needed[,]" JX072 at 95:12–96:2, in order for him to "give . . . access to the IP and the operations of the business to see if [they] could restart it if there was any discernible value[.]" *Id.* at 131:24–15.

[24] JX035; JX036 (reflecting the Defendant holds 66.8% of Authenticity Corp.'s Common Stock, and 23.5% of Authenticity Corp.'s Series A Preferred Stock).

price for Mr. McDonald's Common Stock, "plus any expenses to re-start and support the ongoing operation of the business[,]" predicated on the assumption that the "restart process and sales activity [would] cost approximately $250,000[,]" or "[e]lect not to participate in this round of additional capital and have [his] interest in [the Defendant] diluted pursuant to the terms of the [Defendant's] operating agreement."[25] I discuss the terms of the operating agreement a bit later.

## C. Authenticity Corp.'s Management

In addition to concerns about the value of the Defendant's interest in Authenticity Corp., and potential dilution therefore, the Plaintiff questions Authenticity Corp.'s management.

---

[25] JX034. Like the $15,000 figure, how the $250,000 figure came to be is similarly unclear. Mr. Gregor testified that there were not any relevant records or documents maintained, and that the amount may have stemmed from discussions with Mr. McDonald himself. JX072 at 136:4–137:17. Indeed, Mr. Gregor posits that "companies of [the Defendant's] size, age, [and] state of existence" do not keep records pertaining to shareholder or share transactions and how they are evaluated. *Id.* at 103:21–104:8. Otherwise, Mr. Gregor pointed to the fact that it "was an approximate dollar amount . . . . [and that] in order to restart the business [they] had to do a software code review, restart the AWS environment, [and] reengage legacy developers. . . . [which is] what the approximation is based on." *Id.* at 135:9–14.

Eventually, the Plaintiff learned that some of Mr. McDonald's shares were granted to Juan Ramirez and Steve Coldren, such that each then held roughly 4,600 Authenticity Corp. Common Stock shares. JX036. Again, it is not clear how exactly this came to be, given that the shares held an apparent value of $250,000 for Mr. Ramirez and $100,000 for Mr. Coldren, but Mr. McDonald's roughly 63,000 shares were purchased for about $15,000. In response, Mr. McDonald testified that it is "self-evident[.]" JX072 at 165:4–169:17, 173:5–176:2.

7

Some of those questions arise from payments to Mr. McDonald. As addressed above, Mr. McDonald formed and founded Authenticity Corp. but was no longer CEO and off the board by March 1, 2024. During his tenure, though, Mr. McDonald appears to have set his own salary, to the tune of "somewhere in the range of [$12,000] to $15,000 a month[.]"[26] He also "reimburs[ed] himself for expenses put on his personal credit card, his home equity line of credit."[27]

When Mr. McDonald was removed from the board, the three board members became Messrs. Bryant, Gregor, and Jefferey Stevens.[28] With Mr. McDonald's removal, Kevin Glass and Mr. Stevens were appointed as Authenticity Corp.'s new CEO and COO, respectively.[29] But investors were not informed of these governance changes.[30] Also on the date of Mr. McDonald's removal and replacement, Authenticity Corp. and Mr. McDonald entered into consulting fee and sale bonus side letter agreements. The former agreement confirmed that, while no longer an employee of Authenticity Corp., Mr. McDonald would serve as an independent

---

[26] *Id.* at 78:14–18.

[27] *Id.* at 78:11–14.

[28] JX039 at 1. Mr. Stevens's first name is spelled differently in various places throughout the docket. *Compare, e.g.*, Pretrial Order at p. 26 ¶ 27 (Jeffry Stevens), *with* Pl.'s Op. Br. at 14 (Jeffrey Stevens), *and* JX039 at 1 (Jefferey Stevens). Any misspelling of Mr. Stevens's name in this report is unintentional and no disrespect is intended.

[29] JX039 at 2.

[30] JX072 at 68:19–69:4.

contractor and "provide sales and development consulting services" to it.[31] The latter provided that Mr. McDonald would be entitled to a bonus based on a percentage of the proceeds upon any sale of Authenticity Corp. to "Williams Lea" (a large printing and legal services business), or Williams Lea's affiliate.[32]

### D.    Suspicions Grow

As the Defendant's business struggled, the Plaintiff grew suspicious. By the end of 2021, the Defendant had no cash and had ceased all operations.[33] Shortly thereafter, the Plaintiff started asking questions.

On February 8, 2022, the Plaintiff asked the Defendant for information concerning the Defendant's business structure, seeking to analyze his investment for personal financial and auditing purposes.[34] In response, Mr. Bryant informed the Plaintiff that he had "all documents that have been issued to investors" and attached a document showing "high level investment rationale as [Mr. McDonald] engage[d] with strategic buyers/investors."[35] Thereafter the Plaintiff requested the final

---

[31] Pretrial Order at p. 26 ¶ 25; JX037.

[32] Pretrial Order at p. 26 ¶ 26; JX038; JX070 at 192:11–13.

[33] JX072 at 83:17–86:2, 86:23–87:9.

[34] JX024 at 2.

[35] *Id.*

9

operating documents and the subscription offer signature page, which Mr. Gregor provided.[36]

Then on December 1, 2022, the Plaintiff sought to obtain additional information concerning accounting; specifically, all distributions, 1099s, and K-1s through the present date, as well as any reporting from the Defendant.[37] Mr. Bryant noted in response that there were no K-1s "due to [its] C Corp status" and that "there have been no [1099s] because there have been no dividends."[38] The Plaintiff then asked if there had been any "quarterly, semi[-]annual or annual reporting" sent out, to which Mr. Bryant explained a lack of reporting, likening the void to that of "many early stage investments[.]"[39] Mr. Bryant also noted "[his] read . . . that the company is on life-support and [Mr.] McDonald is in the process of raising more money to add some functionality needed in the software to make it more attractive to his largest client and likely buyer."[40] This forecasting proved apt and, as of June 2023, there was very little money in the Defendant's bank account.[41]

---

[36] *Id.* at 1.

[37] JX050 at 4.

[38] *Id.* at 3.

[39] *Id.* at 2.

[40] *Id.* at 2.

[41] *See* JX072 at 85:12–21 (noting that there was only "$7 or $8 in the [Defendant's bank] account").

Still feeling in the dark,[42] on November 8, 2023, the Plaintiff again requested information pertaining to the performance of both the Defendant and Authenticity Corp.[43] Therein he noted that he had not "received any reporting, quarterly, [semi-annual], annual updates or financials" since his initial investment.[44] As an investor, he identified his "need to understand the performance of [his] investment and would appreciate true and full information regarding the state of the business and financial condition of the company."[45] Mr. Bryant's response informed the Plaintiff of Mr. Bryant's inquisition into "a formal wind-down" to "potentially flag [Authenticity Corp.] as a loss for tax purposes[,]" and that "[a]s feared, [Authenticity Corp.] is basically dormant."[46] Despite this, Mr. Bryant acknowledged that "the vast majority of early stage investments are not successful[,]" but "[t]he good news is that [Mr. McDonald] feels an ethical obligation to try to make this right with the early stage investors that bet on him."[47]

Then, on November 22, 2023, the Plaintiff sent a formal letter through counsel to the Defendant, requesting three categories of information under Title 6, Section

---

[42] *Id.* at 87:10–13.

[43] JX051 at 3.

[44] *Id.*

[45] *Id.*

[46] *Id.* at 2.

[47] *Id.*

11

18-305 of the Delaware Code.[48] Specifically, the Plaintiff sought books and records concerning: (i) the Defendant's business status and financial condition, (ii) its federal, state, and local income tax returns for the years 2019 through 2022, and (iii) a current list of the name and last known residence, business, or mailing address of each member and manager of the Defendant.[49] The Defendant's counsel confirmed receipt on November 27, 2023, reiterating that the Defendant "is simply a feeder entity that serves to aggregate investments in [Authenticity Corp.]" and "has no business operations, financials, etc. of its own."[50] Counsel also shared its concerns about Authenticity Corp.'s lack of transparency and noted that Mr. McDonald was preparing a packet of materials for Messrs. Gregor and Bryant, which would be passed along to the Plaintiff as well.[51] In response, the Plaintiff noted that the Defendant should still "have bank statements, tax filings, a list of members, etc."[52]

On December 13, 2023, the Defendant's counsel responded to the November 22, 2023 request, again explaining that the Defendant serves the purpose only of holding stock in Authenticity Corp., and providing copies of Authenticity Corp.'s: amended and restated certificate of incorporation, amended and restated bylaws,

---

[48] JX052.

[49] *Id.*

[50] JX053 at 2.

[51] *Id.*

[52] JX054 at 2.

shareholder agreement with amendments, current equity capitalization table, and profit and loss statements from 2019 through 2021.[53] The Defendant's counsel further noted that the Defendant is "taxed as a partnership and is a pass-through entity for income tax purposes" and that "[Authenticity Corp.] is taxed as a C corporation and has never made dividends or other distributions to the [Defendant], nor has it passed through any losses to the [Defendant]" and, as such, "has not been required to file, and has not filed, any tax returns since its formation."[54] The Plaintiff did, however, receive the Defendant's redacted equity capitalization table.[55]

On March 18, 2024, the Plaintiff responded through counsel, purporting to renew the November 22, 2023 demand.[56] Therein, he explicitly sought six categories of books and records in the Defendant's possession, custody, or control.[57] The Plaintiff's identified purpose was to "understand[] the valuation and performance of his investment in the [Defendant], which include[d] the purchase of Mr. McDonald's common shares of [Authenticity Corp.]"[58]

---

[53] JX056 at 5. This purportedly encapsulated "all the financial information [Authenticity Corp.] [had] received from Mr. McDonald." *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.* at 2–4.

[57] *Id.* at 3.

[58] *Id.* at 4.

### E.    The Operative Demand

On May 20, 2024, the Plaintiff served, through counsel, the demand for which the Plaintiff seeks inspection through this action (the "Demand").[59] The Plaintiff advances three purposes through which he seeks to inspect the Defendant's books and records: (i) valuation, (ii) investigation of corporate mismanagement, waste, wrongdoing, self-dealing, improper transactions, or independence of directors, and (iii) consideration of potential remedies.[60] In a response dated June 7, 2024, the Defendant refused production, arguing the Plaintiff had sufficient information to value his interest, and that his stated investigative purpose was both facially improper and lacked a credible basis from which any wrongdoing may be inferred.[61]

Through the Demand, the Plaintiff seeks production of thirty broad categories of documents from the Defendant. They are quoted in full for illustrative effect:

---

[59] JX059.

[60] *Id.* at 7–8. Although the Plaintiff identifies consideration of potential remedies as a separate purpose, I instead see it as a remedy connected to the other two stated purposes (and likely moreso the investigative purpose). The Plaintiff appears to agree, having failed to separately brief the issue.

[61] JX061. The Defendant also objected on the grounds that the Defendant and Authenticity Corp. are separate entities, and that the Defendant could only produce Authenticity Corp.-related documents "in its possession" and that it had "no obligation to seek out documents" from Authenticity Corp. The Defendant has since abandoned that position. *See, e.g.*, D.I. 43 at 32 (noting that the Defendant searched all documents and records "exist[ing] within [its] possession and control" and has not withheld responsive information on the basis of belonging to Authenticity Corp., not the Defendant).

1. All iterations of the Companies operating agreement, bylaws, articles of incorporation, and related corporate governance documents in effect from January 2019 to present[;]

2. Documents, including emails or text messages, reflecting all Board or shareholder votes or Companies' actions taken on written consent since January 2019[;]

3. Documents reflecting the current composition of the Board and any changes to the composition of the Board since January 2019[;]

4. Documents, including emails or text messages, reflecting the composition and purpose of any Board committees that have been in existence as of January 2019 or later, including but not limited to any Advisory Board and/or any Special Committees[;]

5. Documents reflecting the compensation of former-CEO Michael McDonald, Manager Alex Gregor, and Manager Michael Bryant from January 2019 to present, including but not limited to any employment as employee or independent contractor, consulting services agreements, stock-related agreements, and amendments to prior agreements[;]

6. Documents, including emails or text messages, reflecting any purchase, transfer, or buy-back of stock by the Company from the Board, officers, executives, or advisors to the Company or other individuals since January 2019[;]

7. Documents, including emails or text messages, reflecting any purchase, transfer, or buy-back of stock by Authenticity from the Board, officers, executives, or advisors to the Company or other individuals since January 2019[;]

8. Documents, including emails or text messages, reflecting copies of and/or the terms of any and all grants of Company stock and/or options to any members of the Board, officers, executives, advisors or other individuals since January 2019[;]

9. Documents, including emails and text messages, concerning or reflecting communications with other Company Investors related to any consents or approvals for any and all grants of Company stock and/or options to any members of the Board, officers, executives, advisors or other individuals since January 2019[;]

10. Authenticity's Board minutes, board decks or other books and records, including emails and text messages, concerning or reflecting any and all grants of Authenticity's stock and/or options to any members of the Board, officers, executives, advisors or other individuals since January 2019, including, but not limited to, the basis for any and all such grants of Authenticity's stock and/or options[;]

11. Company's Board minutes, board decks or other books and records, including emails and text messages, concerning or reflecting any and all grants of Company's stock and/or options to any members of the Board, officers, executives, advisors or other individuals since January 2019, including, but not limited to, the basis for any and all such grants of Company's stock and/or options[;]

12. Documents concerning or reflecting any evaluation or valuation with respect to the Company and any and all grants of Authenticity's stock and/or options to any members of the Board, officers, executives, advisors or other individuals since January 2019[;]

13. Documents, including emails or text messages, reflecting Board and shareholder votes or actions taken regarding the Common Stock Purchase Agreement dated February 29, 2024[;]

14. Documents, including emails or text messages, reflecting requests for further investments made to Company investors[;]

15. Documents, including emails or text messages, reflecting the March 2024 capital call and investors responses to the capital call[;]

16. Documents or notices, including emails or text messages, to shareholders, investors, Board, officers, executives, or advisors, reflecting the termination of the former-CEO and removal from Board of Directors[;]

17. Documents, including emails or text messages, reflecting the share changes of Michael McDonald's interest in Authenticity from 70,000 to 63,538.13 Common Shares, including the addition of two new shareholders of Authenticity since January 2019[;]

18. Documents and notices, including emails or text messages, to shareholders, investors, Board, officers, executives, advisors, reflecting the financial performance and accounting of Companies, including but not limited to quarterly, semiannual, or annual reporting[;]

19. Copies of the federal, state, and local income tax returns for the years 2019-2023[;]

20. Companies' documents, including emails and text messages, concerning or reflecting communications with any investors related to the Operating Agreement, Bylaws or Amended and Restated Certificate of Incorporation[;]

21. Copies of all engagement letter agreements between the Companies' and any outside advisors engaged in connection with any senior executive or Board or Manager compensation, equity awards, and/or option awards, including any amendments thereto[;]

22. All documents and communications provided to the Board, any committee thereof, or any officers concerning the independence or non-independence of any outside advisor, accountant, or consultant engaged in connection with any senior executive or Board compensation, equity awards, and/or option awards[;]

23. All minutes of meetings of Authenticity's Board, or any committee of Authenticity's Board, since January 2019 (or final versions or the most recent draft where final versions are not available), together with any attachments, presentations, reports, or other materials provided to Board members in preparation for or reviewed at those meetings[;]

24. All minutes of meetings of Company's Board, or any committee of Company's Board, since January 2019 (or final versions or the most recent draft where final versions are not available), together with any attachments, presentations, reports, or other materials provided to Board members in preparation for or reviewed at those meetings[;]

25. Any requests or demands for access to the Authenticity' books and records made by the Company, and any responses or books and records provided in response thereto[;]

26. All documents produced to any other investor or their counsel in response to a demand pursuant to Section 220 of the DGCL or Section 18-305 of the Delaware LLC Act, a request for information, or in connection with any investor litigation that relates to any senior executive or Board compensation, equity awards, and/or option awards, as well as transcripts of any depositions of the Companies' managers, officers or directors taken in connection with any such litigation[;]

27. Board minutes, board decks, offering materials or other books and records, including emails and text messages related to any solicitation or offers for 4% or more of the Authenticity's stock and/or for 4% or more of the Authenticity's assets[;]

28. Board minutes, board decks, offering materials or other books and records, including emails and text messages related to any solicitation or offers for 4% or more of the Company's stock and/or for 4% or more of the Company's assets[;]

29. Any agreements related to compensation, equity awards, and/or options awards or other forms of compensation to any members of the Board, officers, executives, senior advisors or other individuals related to a potential sale of Authenticity or the Company[;]

30. Documents sufficient to show (i) any business or social relationships between and among any Board members outside of attendance at Companies Board meetings; (ii) any business or social relationships between or among the Option Grant recipients other than their employment at Authenticity; and (iii) any business or social relationships between and among any Board members and any member of any Advisory or Special Committee.[62]

Objections aside, the Defendant, through counsel, provided line-item responses to each of the thirty categories of documents sought, and offered a phone or video call with Messrs. Gregor, Bryant, Stevens, and Glass, to receive "an update

_____

[62] JX059 at 5–7. Individually I refer to each as a "Request," and collectively, as the "Requests."

18

on the status of [Authenticity Corp.'s] business prospects."[63] Per the Defendant, the Plaintiff "repeatedly refused" such offers,[64] and it appears no call ever took place.[65]

## F. This Litigation

Unsatisfied with the Defendant's response and earlier productions, on July 23, 2024, the Plaintiff initiated this action seeking a court-ordered production and fee shifting.[66] The Chancellor assigned this matter to me on July 24, 2024, and after a few extensions, I entered a scheduling order, and later an amended version, initially scheduling this matter for trial on January 15, 2025.[67] Through that amended scheduling order, I also granted the parties' stipulation to present this matter to me "for a final decision[,]" such that the parties "waive[d] the right to seek further judicial review of [my] decision at the trial level[,]" instead agreeing that my decision would be "subject to direct appeal to the Delaware Supreme Court[.]"[68]

---

[63] JX061 at 4–8.

[64] D.I. 43 at 17.

[65] The Plaintiff failed to explain clearly why the offer was not accepted. It seems implicitly, however, that he did not feel one would be prudent given Mr. Glass's concerns. *See* D.I. 45 ("Pl.'s Reply Br.") at 4–6.

[66] D.I. 1.

[67] D.I. 2, 19, 35; *see* D.I. 13–17.

[68] D.I. 35.

At the parties' request, after the first pretrial conference,[69] I rescheduled and ultimately presided over trial on February 20, 2025.[70] After hearing the parties' presentations, though, I remained concerned that the parties had not joined issue sufficiently on the scope of any court-ordered production. Thus, I directed the parties to work together on a joint chart, using a form provided by my chambers. The parties filed the completed chart on February 28, 2025.[71] I then took this matter under advisement the following week, on March 5, 2025, when the Plaintiff's trial demonstrative was docketed.[72]

## II.    ANALYSIS

Section 18-305(a) affords members of a Delaware limited liability company the right "from time to time upon reasonable demand for any purpose reasonably related to the member's interest as a member of the limited liability company" to

---

[69] *See* D.I. 57.

[70] *See* D.I. 54–55, 61, 68.

[71] *See* D.I. 61–62, 67. Roughly a week before the chart was filed, the Defendant's counsel informed me via letter of a misstatement made at trial. D.I. 63. Specifically, counsel explained that his representations about a metadata discrepancy (explained more fully below), were unintentionally inaccurate. *Id.* I accept counsel's representation as an officer of the Court. But I agree with the Plaintiff that the Defendant's counsel had ample opportunity to inform the Plaintiff's counsel of his explanation far ahead of trial. I disagree, however, that the delayed communication and trial misstatement "[are additional] example[s] of post-demand conduct that further bolster[] [the Plaintiff's] articulated proper purposes in his Demand[.]" D.I. 64 at 5. I likewise disagree, as more fully explained below, that this conduct supports fee shifting.

[72] D.I. 69.

20

obtain books and records from the company.[73] Demands for inspection "shall be in writing and shall state the purpose of such demand."[74] Once a member has established she is entitled to obtain information, "the member's right shall be to obtain such information as is necessary and essential to achieving that purpose."[75]

Inspection rights under Section 18-305 may be either expanded or limited by the governing limited liability company agreement.[76] The Defendant's operating agreement provides that records and information "shall be subject to inspection and/or copying at the request and at the expense of any [m]ember or its representative upon reasonable notice, during normal business hours, for any proper purpose reasonably related to such [m]ember's interest in the [Defendant]."[77] Because this language neither expands nor restricts the Plaintiff's inspection rights, his rights remain "co-extensive with Section 18-305[.]"[78]

---

[73] I refer to Title 6, Section 18-305 more broadly as "Section 18-305."

[74] 6 *Del. C.* § 18-305(e).

[75] *Id.* § 18-305(g).

[76] *Id.* ("The rights of a member or manager to obtain or examine information as provided in this section may be expanded or restricted in an original limited liability company agreement or in any subsequent amendment approved or adopted by all of the members or in compliance with any applicable requirements of the limited liability company agreement.").

[77] JX002 at 8.

[78] *Sanders v. Ohmite Hldgs., LLC*, 17 A.3d 1186, 1193 (Del. Ch. 2011).

The Plaintiff seeks to inspect thirty categories of books and records, which, through his pretrial opening brief, he argues "are necessary and essential to [the] proper purpose of valuing his membership units" of the Defendant.[79] Alternatively, though, the Plaintiff argues if the Court should determine any of his requests are unrelated to his valuation purpose, then "they are related to [the Plaintiff's] investigation into corporate waste, mismanagement, self-dealing, improper transactions, and/or the independence of the directors[.]"[80]

The Defendant has refused further production and defends against this action arguing the Plaintiff already has sufficient information to value his units, and that his stated investigative purpose is facially improper. I diverge on the former but agree mostly with the latter, departing only slightly. As more fully explained herein, I hold the Plaintiff has established two proper purposes: valuation and investigation into mismanagement. And the Plaintiff has identified that valuation-related gaps remain in the Defendant's production, supporting a limited court-ordered production, as well as one avenue through which he has established a credible basis to infer mismanagement. The bulk of the Plaintiff's requests, however, fall outside this scope and the Plaintiff's amorphous investigation purpose cannot (in large part) save the day. Consistent therewith, outside of that expressly listed below, the request

---

[79] Pl.'s Op. Br. at 27.

[80] *Id.*

for any further production is denied, as are the fee requests; the parties shall bear their own fees, though costs shall be shifted to favor the Defendant.

## A. The Plaintiff has established two proper purposes for inspection.

"To inspect books and records, a member of a Delaware LLC, like a stockholder of a Delaware corporation, must first establish by a preponderance of the evidence the existence of a proper purpose for inspection."[81] A proper purpose is any purpose "reasonably related to the member's interest as a member[.]"[82]

In the Demand, the Plaintiff stated three purposes for his inspection request: (i) valuation, (ii) investigation of corporate mismanagement, waste, wrongdoing, self-dealing, improper transactions, or independence of directors, and (iii) consideration of potential remedies (which, as discussed, I do not consider to be a separate purpose in and of itself). Such is not uncommon; stockholders and members often state multiple purposes. But even a lengthy list does not relieve them of proof by a preponderance that one (or more) of their stated purposes: (1) genuinely exists, and (2) is reasonably related to their interest in the company. To determine as much,

---

[81] *Sanders*, 17 A.3d at 1193 (citation and quotation marks omitted). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) (citation and quotation marks omitted).

[82] 6 *Del. C.* § 18-305(f)(2).

this Court typically undertakes a purpose-by-purpose analysis, addressing the purposes on which the requester stood in the proceeding.

The Defendant asks me to eschew a seriatim review. The Defendant contends the Demand is facially improper due to its sweeping scope, and that I need not dig any deeper. I disagree.

The Defendant is correct that, in extreme cases, this Court has foregone a purpose-by-purpose analysis when faced with a facially improper demand. The most well-known example, from the corporation context, is *Highland Select Equity Fund, L.P. v. Motient Corp.*[83] Therein, Vice Chancellor Lamb denied a books and records request, which was served amid an ongoing proxy context and spanned twenty-five single-spaced pages, including forty-seven categories of requested records. In doing so, he emphasized the requester's responsibility to make a demand in good faith, which must be "policed by the court's duty to closely examine any . . . demand to prevent possible abuse of the . . . right of inspection."[84] He recognized that the "potential for abuse is very much alive . . . in the context of an impending or ongoing

---

[83] 906 A.2d 156 (Del. Ch. 2006). Although a corporate books and records action, "Delaware courts have interpreted Section 18-305 by looking to cases interpreting similar Delaware statutes concerning corporations and partnerships." *Sanders*, 17 A.3d at 1193 (citation and quotation marks omitted).

[84] *Id.* at 164 (citation and quotation marks omitted).

proxy contest[,]"[85] and found the demand before him "extraordinarily overbroad."[86] Coupled with the requester's concerning course of conduct (including its delay and public posting of the demand "several times"), the Vice Chancellor found "a remarkable confluence of events that amount to an abuse of . . . process, designed for some purpose other than to exercise [the plaintiff's] legitimate rights" to inspect corporate records.[87]

The stockholder appealed the Vice Chancellor's ruling to the Delaware Supreme Court, which initially remanded the matter with three questions: (1) "[d]id the court find that all of [the requester's] actual purposes were improper?" (2) "[i]f so, what were [the requester's] actual purposes and why did those purposes preclude relief . . .?" and (3) "[i]f the court found that some of [the requester's] actual purposes were proper, on what basis did the court determine that [the requester] was not entitled to relief that would address those proper purposes?"[88]

On remand, the Vice Chancellor clarified that the requester stated two purposes: (1) to investigate possible mismanagement, and (2) to communicate with

---

[85] *Id.*

[86] *Id.* at 165.

[87] *Id.* at 167.

[88] *Highland Select Equity Fund, L.P. v. Motient Corp.*, 2007 WL 907650, at *1 (Del. Ch. Mar. 14, 2007).

other investors regarding the proxy contest.[89] He continued that those "stated purposes are, of course, proper purposes under the law and nothing in the [o]pinion was intended to suggest otherwise."[90] But the Vice Chancellor held that the requester's actual improper purpose was evident from the form of the demand, the context in which it was made (the ongoing proxy contest), and the requester's litigation conduct.[91] With these questions clarified, the Vice Chancellor's ruling was affirmed without discussion.[92]

Corporate defendants often invoke *Highland Select*, arguing, in essence, that this Court must deny all overbroad demands. In *NVIDIA Corp. v. City of Westland Police & Fire Retirement System*, the Delaware Supreme Court held otherwise: "There is no blanket rule that requires the Court of Chancery to outright deny those demands that it finds to be overbroad."[93] Rather, this Court "has discretion to look at an overbroad demand and either identify the records that should be produced or to decide that it will not 'pick through the debris' of an impermissibly overbroad demand that abuses the . . . process."[94]

---

[89] *Id.*

[90] *Id.*

[91] *Id.* at *1–2.

[92] *Highland Equity Fund, L.P. v. Motient Corp.*, 922 A.2d 415 (Del. 2007) (ORDER).

[93] 282 A.3d 1, 14 (Del. 2022), *as revised* (July 25, 2022).

[94] *Id.*

This action is not *Highland Select*; not even close. There is no public, ongoing proxy contest. There is no record that the Plaintiff is using this action to support a public campaign of sorts. And there is no pattern indicative of an abuse of process. Sure, the Demand is comparable in scope and breadth to that in *Highland Select*, but absent a greater record of abuse, ulterior motives, or bad faith, the Demand is not facially improper such that the inquiry should end before it begins. Instead, I exercise my discretion to conduct a purpose-by-purpose review and "choose to craft a production order circumscribed with rifled prevision."[95]

In my seriatim review, I limit myself to the Plaintiff's purposes of valuation and investigation, because the Plaintiff's third purpose is intertwined within both. As to the two remaining purposes, both are proper, but to a very limited degree.

### 1. The Plaintiff's valuation purpose is proper.

Under Delaware law, a member's desire to value her interests in a company, particularly in a closely held company, "has long been recognized as a proper purpose[.]"[96] As aptly explained by Vice Chancellor Laster:

> Because they do not receive the mandated, periodic disclosures associated with a publicly held [company], minority shareholders in a privately held [company] face certain unique risks. Such shareholders may, therefore, have a legitimate need to inspect the [company's] books and records to value their investment, in order to decide whether to buy

---

[95] *Id.*

[96] *Woods Tr. of Avery L. Woods Tr. v. Sahara Enters., Inc.*, 238 A.3d 879, 890 (Del. Ch. 2020) (citation and quotation marks omitted).

additional shares, sell their shares, or take some other action to protect their investment.[97]

With these interests in mind, proving a genuine valuation purpose is not a difficult task for an investor in a closely held company. The Plaintiff has met his burden. The burden, thus, shifts to the Defendant "to prove that the [Plaintiff]'s avowed purpose is not [his] actual purpose and that [his] actual purpose for conducting the inspection is improper."[98] Unlike the Plaintiff's minimal burden, the Defendant faces a higher bar: "our courts have given credence to such defenses only where it is evident from the facts on the record that the plaintiff's actual, predominating, purpose is something unrelated to the plaintiff's purpose as a [member]."[99]

Such is not evident from the record before me. The Defendant's primary argument is that the Demand is overbroad, sweeping, and more akin to plenary discovery than a targeted valuation demand. To some extent I agree. As shown by my lengthy block quote of the categories demanded, the Plaintiff's request has an air of overreaching or overzealousness to it. But, absent a greater record indicative of

---

[97] *Id.* (citing *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 685 A.2d 702, 713) (Del. Ch. Dec. 19, 1995)).

[98] *Id.* at 891.

[99] *Sutherland v. Dardanelle Timber Co.*, 2006 WL 1451531, at *9 (Del. Ch. May 16, 2006).

an abuse of process, I find the breadth insufficient to show pretext; it is, rather, best addressed through a narrowed scope of court-ordered production.

> **2.** **In large part, the Plaintiff's investigation purpose is overbroad, but one narrow issue is supported by a credible basis to suspect wrongdoing.**

The Plaintiff also seeks to "investigate corporate mismanagement, waste, wrongdoing, self-dealing, improper transactions, and/or independence of directors[.]"[100] Under Delaware law, desiring to investigate mismanagement is a proper purpose. But to establish such a purpose, "a member 'must present some evidence to suggest a credible basis from which a court can infer that . . . wrongdoing may have occurred.'"[101] "The credible basis standard imposes the lowest possible burden of proof . . . . [and] . . . does not require a member to show by a preponderance of the evidence that wrongdoing is probable."[102] "It requires only that a member establish by a preponderance of the evidence that there is a credible basis to suspect a possibility of wrongdoing."[103] "That burden may be satisfied by a credible

---

[100] Pl.'s Op. Br. at 1.

[101] *Gill v. Regency Hldgs., LLC*, 2023 WL 4607070, at *13 (Del. Ch. June 26, 2023) (ellipsis in original) (quoting *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461, at *10 (Del. Ch. Nov. 24, 2020)).

[102] *Id.* (citation and quotation marks omitted).

[103] *Id.* (cleaned up) (citation omitted).

showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[104]

Low as the bar may be, this Court "strive[s] to carefully balance . . . inspection right[s] against legitimate [company] interests."[105] In doing so, the Court will not permit fishing expeditions, allowing the requester "to act as [an] inquisitor[], searching a [company's] documents for any hint of transgression."[106] This limitation was explained most recently by Vice Chancellor Will in *Roberta Ann K.W. Wong Leung Revocable Tr. U/A Dated 03/09/2018 v. Amazon.com, Inc.*[107] Therein, the Vice Chancellor held that a stockholder failed to state a proper purpose for investigation because the investigation purpose was "astoundingly broad" in that it "concern[ed] *any* possible anticompetitive conduct by a global conglomerate at *any* time *anywhere* in the world."[108] The breadth of that purpose ran afoul of the basic requirement under Delaware law that investigation purposes need more than mere curiosity or the desire for a fishing expedition.[109] Without more, the Vice Chancellor

---

[104] *Id.* (citation and quotation marks omitted).

[105] *Roberta Ann K.W. Wong Leung Revocable Tr. U/A Dated 03/09/2018 v. Amazon.com, Inc.*, 2024 WL 4564754, at *6 (Del. Ch. Oct. 24, 2024).

[106] *Id.*

[107] *Id.*

[108] *Id.* at *5 (emphasis in original).

[109] *Id.*

found any further inquiry into the purported credible basis to suspect wrongdoing unnecessary.

The Demand, here, has similar flaws. True, the Defendant is not a "global conglomerate," but the Plaintiff, like the stockholder in *Amazon*, vaguely and broadly cries foul with how the Defendant has conducted its affairs in toto. He then couples his overarching, amorphous concerns with thirty discovery-style requests. This pairing represents a fishing expedition ill-suited for a summary books and records proceeding.[110]

Nevertheless, I have closely reviewed the Plaintiff's alleged wrongdoing and see the potential wrongdoing in connection with: (1) the request for additional contributions and warning of dilution, and (2) the discrepancy between the number of Series A Preferred Stock shares Authenticity Corp. is authorized to issue and those purportedly owned by the Defendant. The remaining vague, overgeneralized

---

[110] The Plaintiff also seems to suggest that he already has information sufficient to initiate plenary litigation toward his investigation purpose, undermining the propriety thereof. *See, e.g.*, Pl.'s Op. Br. at 6 ("[The Plaintiff] has uncovered more than sufficient evidence of corporate waste, mismanagement, wrongdoing, self-dealing and improper transaction."); Pl.'s Reply Br. at 7 ("[T]he bank records [the Plaintiff received] reflect that nearly $160,000 was spent from Authenticity [Corp.'s] bank account with no explanation or recording in the [profit and loss statements.]") (emphasis omitted); Tr. at 38:4–9 (averring that the Defendant's deposition testimony "reflects that it abandoned its [fiduciary] duty of good faith"); *id.* at 38:24–39:3 ("[T]he [D]efendant breached its duty of care and loyalty and good faith to the investors by not providing . . . critical information about their investment to them in a timely fashion."). Nevertheless, I exercise my discretion to review the Demand closely and craft a production order.

31

allegations are rejected as unsupported by even the minimal credible basis required;[111] I address the two remaining concerns in turn.

The Plaintiff argues that he was asked to invest more money into the Defendant to avoid having his interest diluted, without any updates or documentation as to how the amount of money sought was calculated or maintained. But he has failed to justify how such supports a credible basis, given the subscription agreement. Section 5.2(b), therein, provides: should management determine it "necessary or desirable" to obtain additional funds, management is directed to notify members of the total amount of capital required by the company, the portion of such amount to be contributed by each member according to their capital percentage, and the date such capital is required to be contributed to the company.[112] The agreement further provides that "[a]dditional capital contributions under this paragraph are voluntary," and:

> In the event that the entire [amount of required capital] is not contributed by all members in proportion to their capital percentages in

---

[111] The Plaintiff struggled to articulate his specific investigatory purpose. *Compare, e.g.*, Pl.'s Op. Br. at 26 (describing the Plaintiff's purpose to "investigat[e] corporate waste, mismanagement and potential wrongdoing) *with id.* at 1 (describing the Plaintiff's purpose to investigate corporate mismanagement, waste, wrongdoing, self-dealing, improper transactions, and/or independence of directors"). The Plaintiff also testified that he "would like to have all the information [he] could possibly get to make a judgment." JX070 at 63:10–11; *accord id.* at 130:4–10 ("There are a number of things that in my mind don't add up. And I just want the facts. If it adds up, it adds up. If it doesn't, then I want to understand why it doesn't add up. And the only way I can do that is by getting information, looking at the information, and making, what I consider, a good business decision.").

[112] JX002 at 10–11.

effect immediately prior to the first requirement notice, the capital percentages of the members shall be adjusted with prospective effect to take account of the additional capital contributions made by the contributing members in relation to the sum of (A) those additional capital contributions and (B) in management's discretion, either (I) the aggregate among of the capital contributions (whether or not returned) of the members immediately prior to the additional capital contributions or (II) the net fair market value of the company's assets as such time (as determined by management).[113]

The Plaintiff received the requisite notice of the amount of required capital, was given the opportunity to contribute, and elected not to do so (as was his right). In declining to exercise that right, the Plaintiff was aware that his capital percentage would "be adjusted with prospective effect to take account of the additional capital contributions" made by those members who elected to participated.[114] Further, even after declining to do so, the Plaintiff was afforded the opportunity to belatedly participate in the capital call, at which point "his initial percentage interest in the LLC [would] be restored."[115] He again chose not to do so.

On this record, the Plaintiff has failed to demonstrate a credible basis to suspect wrongdoing in connection with the capital call. The Plaintiff was provided notice that additional capital was sought, afforded the opportunity to partake in the raise (not once, but at least twice), and made aware of the risks inherent with

---

[113] *Id.* at 11 (emphasis omitted in first quote) (capitalization of terms omitted).

[114] *See id.*

[115] JX043 at 1.

investing in the Defendant, including of dilution should he not choose to participate in later capital calls. Thus, even if I overlook the fishing nature of the Plaintiff's investigatory purpose, he has nonetheless failed to introduce sufficient evidence of a credible basis to suspect a possibility of wrongdoing in connection with the call.

But the Plaintiff has met his burden to show a credible basis to suspect wrongdoing in connection with the stock discrepancy. Specifically, the Plaintiff has identified a discrepancy between the number of shares of Series A Preferred Stock Authenticity Corp. is authorized to issue, versus the number of shares apparently owned by the Defendant.[116] When asked about the discrepancy at his deposition, Mr. Gregor explained that a cap table reflects the apparent increased issuance of Series A Preferred Stock, which he posits is reflected in "individual subscription agreements."[117] He further offered that there was no "increased issuance," and that instead investors "invested additional capital into the business" because the company "basically left open the round."[118] When pressed on the issue further, Mr. Gregor testified that perhaps the certificate of incorporation was amended, and in fact he "believed" it was.[119] Accordingly, the Plaintiff's counsel requested a copy of any

---

[116] *Compare* JX007 at 3, *with* JX012.

[117] JX072 at 220:5–221:15.

[118] *Id.* at 221:21–222:1.

[119] *Id.* at 232:21–233:7.

such amended certificate of incorporation.[120] But after Mr. Gregor's deposition, the Defendant's counsel represented that in fact the certificate had not been amended.[121]

The Defendant's counsel attempted to explain away the discrepancy at trial, expressing that apparently "the first tranche, identified in the certificate as Series A, is only 17,500[,]"[122] insinuating that perhaps a later tranche authorized the issuance of more Series A Preferred Stock. I have closely reviewed JX007 (the amended and restated certificate of incorporation) and found no indication that the 17,500-cap applied only to an initial tranche. Highlighting these discrepancies and uncertainty, the Plaintiff has established a credible basis to suspect potential wrongdoing regarding the nature and extent of the Defendant's ownership interests in Authenticity Corp.[123]

---

[120] *Id.* at 234:4–17.

[121] Pl.'s Op. Br. at 11; Tr. at 45:16–18.

[122] Tr. at 48:12–22.

[123] As expressed in 8 *Del. C.* § 102(a)(4), "[i]f the corporation is to be authorized to issue more than 1 class of stock, the certificate of incorporation shall set forth the total number of shares of all classes of stock which the corporation shall have authority to issue and the number of shares of each class and shall specify each class the shares of which are to be without par value and each class the shares of which are to have par value and the par value of the shares of each such class." *See also id.* § 161 ("The directors may, at any time and from time to time, if all of the shares of capital stock which the corporation is authorized by its certificate of incorporation to issue have not been issued, subscribed for, or otherwise committed to be issued, issue or take subscriptions for additional shares of its capital stock up to the amount authorized in its certificate of incorporation."). That the Defendant purports to own more Series A Preferred Stock than Authenticity Corp. appears authorized to issue from the documents produced thus far supports a credible basis to suspect wrongdoing or mismanagement, which should be explored further.

**B.** **The Plaintiff is only entitled to books and records that are necessary and essential to his proper purposes.**

Having found the Plaintiff established proper valuation and investigation purposes, I must now address the scope of any further inspection. Under Section 18-305(g), a "member's right [of inspection] shall be to obtain such information as is necessary and essential to achieving that purpose." The Plaintiff bears "the burden of proving that each category of books and records is essential to accomplishment of the [member's] articulated purpose for the inspection."[124] That burden requires the Plaintiff to "make specific and discrete identification, with rifled precision, of the documents sought."[125]

The Plaintiff's lackadaisical treatment of his burden is disappointing. At the close of trial, the Plaintiff had not clarified which of the thirty requests remained outstanding and to what extent. The Plaintiff also took the unhelpfully broad position that all thirty requests related to all purposes. Thus, at the close of trial, the Plaintiff had failed to meet his burden to identify the necessary and essential records for a court-ordered production. Recognizing as much, and aware of my discretion to address such deficiency, I gave the Plaintiff a second chance: I directed the parties

---

[124] *Emps.' Ret. Sys. of R.I. v. Facebook, Inc.*, 2021 WL 529439, at *4 (Del. Ch. Feb. 10, 2021) (citation and quotation marks omitted).

[125] *Riker v. Teucrium Trading, LLC*, 2020 WL 2393340, at *4 (Del. Ch. May 12, 2020) (citation and quotation marks omitted).

to put together a joint chart identifying, request by request, "[t]he documents that were produced [and] the documents that exist for further production" along with each side's response.[126]

Relying on that chart, I find the following outstanding books and records necessary and essential to the Plaintiff's valuation purpose: documents reflecting the financial performance and accounting of both the Defendant and Authenticity Corp. (including quarterly, semi-annual, and annual reporting), including QuickBooks, to the extent they exist, which are not already captured in the documents produced. As to the Plaintiff's investigation purpose, I find the following outstanding books and records necessary and essential: those sufficient to show the propriety of Authenticity Corp.'s issuance of Series A Preferred Stock greater than that allowed by its certification of incorporation dated August 23, 2019.

For a valuation purpose, the books and records a plaintiff is entitled to inspect typically center around financial statements, projections, and others within that realm.[127] A plaintiff is similarly "entitled to information reflecting 'basic information about how [the company's managers] are compensated'" and "how their

---

[126] Tr. at 133:23–134:5.

[127] *See Greenlight Cap. Offshore P'rs, Ltd. v. Brighthouse Fin., Inc.*, 2023 WL 8009057, at *8 n. 103 (collecting cases standing for the proposition that the Court has granted inspections of cash flow projections, including management's financial productions); *id.* at *9 n.110 (collecting cases pertaining to inspection of financial statements and data).

37

fiduciaries are taking money out of the corporation."[128] As to an investigative purpose, "the stockholder should be given enough information to effectively address the problem[.]"[129]

The requests in the Demand can be grouped into eight broad categories of requested records: (I) governance (Requests 1 and 20), (II) acts and transactions (Requests 2, 9, 13 through 16, 27, and 28), (III) composition (Requests 3, 4, 22, and 30), (IV) compensation (Requests 5 and 21), (V) independence and interested-party or "other" payments and transactions (Requests 6 through 8, 10, 11, 17, and 29), (VI) valuation and financial performance (Requests 12, 18, and 19), (VII) general minutes (Requests 23 and 24), and (VIII) other books and records requests (Requests 25 and 26).

Several categories are nonstarters. The Plaintiff has failed to articulate any cognizable way in which categories (I) through (III), (VII), or (VIII) relate, let alone are necessary and essential, to his valuation or investigation purposes. The Defendant has also demonstrated that many of those requests were addressed through prior productions, for which the Plaintiff has failed to identify any valuation-related or proper investigatory gaps. I address the rest (IV, V, and VI) in turn.

---

[128] *Gill*, 2023 WL 4607070, at *20 (quoting *Woods*, 238 A.3d at 900–01). "More fundamentally, how directors and senior officers are compensated and whether they are the beneficiaries of any related-party transactions are basic facts that stockholders are entitled to know." *Woods*, 238 A.3d at 900.

[129] *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 115 (Del. 2002).

38

Through (IV), the Plaintiff seeks documents reflecting Messrs. McDonald's, Gregor's, and Bryant's compensation, from January 2019 through present, including any employment as employee or independent contractor, consulting services agreements, stock-related agreements, and amendments to prior agreements, and copies of engagement letter agreements with outside advisors engaged in connection with senior executive or board or manager compensation, equity awards, or option awards, along with amendments thereto. But the Plaintiff has already received the consulting fee and bonus-on-sale-of-company agreements, both dated March 1, 2024, and has failed to identify additional outstanding documents responsive to these Requests which are likely to exist and necessary and essential to the Plaintiff's purposes.[130]

Through (V), the Plaintiff seeks: (a) documents reflecting any purchase, transfer, or buy-back of stock from the board, officers, executives, or advisors to the Defendant or "other individuals" since January 2019, (b) documents reflecting copies of or the terms of grants of the Defendant's stock or options to board members, officers, executives, advisors, or "other individuals" since January 2019, (c) board minutes, board decks, "or other books and records," concerning or reflecting grants of stock or options to board members, officers, executives, advisors,

---

[130] *See Dobler v. Montgomery Cellular Hldg. Co.*, 2001 WL 1334182, at *9 (Del. Ch. Oct. 19, 2001) ("Naturally, if the records . . . do not exist, the Defendant has no duty to do the impossible.").

or "other individuals" since January 2019, including the basis for any such stock grants or options, (d) documents reflecting the share changes of Mr. McDonald's interest in Authenticity Corp. from 70,000 to 63,538.13 common shares, "including the addition of two new shareholders of Authenticity [Corp.] since January 2019[,]" and (e) agreements related to compensation, equity awards, or options awards or other forms of compensation to board members, officers, executives, senior advisors, or "other individuals" related to a potential sale of either the Defendant or Authenticity Corp. But the Plaintiff has already received the Stock Purchase Agreement, capitalization tables, and emails regarding the November 22, 2023 demand, and has failed to identify additional outstanding documents responsive to (a), (c), (d), or (e) which are likely to exist and necessary and essential to the Plaintiff's valuation purpose, and for the bulk of his investigative purpose.[131]

The records requested in (b) are, however, necessary and essential to the Plaintiff's investigative purpose, at least in part. Now that the stock discrepancy issue has been clarified, I decline to accept that "[n]o outstanding responsive documents exist[,]" as the chart reflects, and direct the Plaintiff to search once more, and produce those documents that exist for inspection. Should the Defendant again confirm that no such books and records exist in support thereof, the lack of documents clarifying the discrepancy is likely on its face "enough information to

---

[131] *See id.*

effectively address the problem, either through litigation or through direct contact with the corporation's directors and/or stockholders."[132]

For (VI), the Plaintiff seeks: (a) documents concerning or reflecting any evaluation or valuation with respect to the Defendant and all grants of Authenticity Corp.'s stock and/or options to any board members, officers, executives, advisors, or "other individuals" since January 2019 (boiled down to whether the Defendant "performed any evaluation or valuation with respect to its performance"),[133] (b) federal, state, and local income tax returns for 2019 through 2023, and (c) documents and notices to shareholders, investors, the board, officers, executives, or advisors, reflecting the financial performance and accounting of both the Defendant and Authenticity Corp. (including quarterly, semi-annual, and annual reporting).

I accept the Defendant's representation that no such documents exist responsive to (a) or (b) and thus will not order further production.[134] But records responsive to (c), specifically QuickBooks records, are outstanding and necessary and essential to the Plaintiff's valuation purpose.[135] The Defendant must, therefore, collect and produce in response to (c).

---

[132] *Saito*, 806 A.2d at 115.

[133] JX072 at 123:19–125:1.

[134] *Id.* at 138:2–5, 186:21–24; *see Dobler*, 2001 WL 1334182, at *9 ("Naturally, if the records . . . do not exist, the Defendant has no duty to do the impossible.").

[135] To date, the Plaintiff has received some bank statements and internal profit and loss statements. *See* JX013; JX062; JX079 at 212–50. The Defendant represented in the chart

**C.** **Each side should bear its own fees under the American Rule, but costs should be shifted in the Defendant's favor.**

The Plaintiff asks that his fees and costs be shifted to the Defendant under the bad faith exception to the American Rule.[136] I find no evidence of bad faith and thus decline to shift fees. I do, however, deem the Defendant the overall "prevailing party," and thus shift costs in its favor.

"Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees, which, in equity, may be awarded at the discretion of the court."[137] Conversely, under Court of Chancery Rule 54(d), "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs." The Plaintiff has failed to prove an exception to the American Rule, and the Defendant is the "prevailing party."

---

that "[n]o outstanding responsive documents exist" in response to (c). *See* D.I. 67. But Mr. Gregor admitted that the Defendant did not "see a reason to" ask Mr. McDonald to provide his QuickBooks documents. JX072 at 179:3–10. He then went on to explain that he did not find those QuickBooks to be responsive to the Request. *Id.* at 179:11–180:2. Thus while the representation on the chart comports with Mr. Gregor's testimony that he (in his capacity as the Defendant's corporate representative) does not believe the QuickBooks or anything of the like to be responsive to the Request, I disagree. The Plaintiff is entitled to them, to the extent they exist, and to the extent not already captured in the documents produced.

[136] Although the Plaintiff does not explicitly spell out in his pretrial briefing that his request stems from the bad faith exception, the arguments he makes therein offer that inference. *See* Pl.'s Op. Br. at 37–38.

[137] *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850 (Del. Ch. 2005).

The Plaintiff avers that he is entitled to fees and costs because the Defendant obstructed the Plaintiff's statutory right, "seemingly attempted to manufacture documents" to corroborate deposition testimony, and attempted to "wear [the Plaintiff] down."[138] I disagree. The Plaintiff failed to prove any manufacturing and, although the transcripts before me indicate some regrettable deposition conduct, it does not rise to the level of bad faith litigation.[139] Further, although I am ordering a limited production, I would be remiss not to emphasize the Defendant's voluntary productions in response to the Demand; such are indicative of good—rather than bad—faith.[140]

Under Rule 54(d), costs will be shifted in favor of the prevailing party. This Court has defined a prevailing party as "the party who successfully prevails on the merits of the main issue or on *most* of her claims."[141] Under this lens, the Defendant is the prevailing party; it successfully defended its earlier productions, and will only be compelled to produce a small subset of documents, which I have identified, in my

---

[138] Pl.'s Op. Br. at 37–38.

[139] As addressed in my factual recitation, counsel's conduct at Mr. Gregor's deposition was difficult to read. Although counsel acted in a way I cannot bless or condone, his conduct does not rise to the level of "glaringly egregious" conduct sufficient to shift fees.

[140] The Defendant belatedly asked at trial that fees be shifted in its favor. Tr. at 91:12–17. This delayed articulation could be viewed as waiver. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."). On its merits, though, it also fails; there is no evidence of bad faith, glaringly egregious conduct by the Plaintiff.

[141] *Adams v. Calvarese Farms Maint. Corp.*, 2011 WL 383862, at *3 (Del. Ch. Jan. 13, 2011) (emphasis in original).

discretion, by carefully parsing through the Plaintiff's overbroad requests in the Demand. With such minimal court-ordered production, the Defendant largely prevailed, and costs should be shifted in its favor.

## III. CONCLUSION

For these reasons, the Demand is largely rejected, but the Defendant is directed to collect and produce, as further explained above, documents responsive to (V)(b) and (VI)(c), which are not already captured in the documents produced. The parties are directed to meet and confer regarding the timing and mechanics of such production and submit a proposed implementing order, within five business days, reflecting the rulings herein.

This a magistrate's report, which will become final when I issue an implementing order. As noted, the parties have stipulated that this action be submitted for a final decision under Court of Chancery Rule 144(g), meaning they have waived the right to seek further judicial review of this decision at the trial level. Any challenge to these rulings, once final, shall be subject to the same procedural and substantive standards as are applicable to appeals from decisions of the Chancellor or a Vice Chancellor.